## HENRY FITCH v. THE STATE.

### No. 1078.   Decided June 27th, 1896.

#### 1.   Homicide not Murder When—Tests as to.

On a trial for murder, where the case presents no evil or cruel disposition on the part of the accused, and the homicide was not committed in the perpetration of a. felony, in order to constitute it a case of either murder or manslaughter, it is essential that the evidence should establish an intent to kill.

#### 2.   Same—Intent to Kill—Instruments and Means Used.

On the question of the intent to kill, the instrument or means used in the homicide must be considered. If it be one likely to produce death, the jury may infer therefrom the intention to kill. But, it does not follow that in every killing committed with an instrument likely to produce death, the intention to kill existed. The fact of the intention must be established and found by the jury.

#### 3.   Same—Question of Fact and not Law—Charge.

The intent to kill can be established by the instrument used. If it is likely to produce death, the jury would be warranted in finding an intention to kill, but as matter of law, this is not the case. It is still a question of fact for the jury and the court must, in the charge, submit the question to the jury.

APPEAL from the District Court of Hopkins. Tried below before Hon. E. W. TERHUNE.

Appeal from a conviction for murder in the second degree; penalty, six years' imprisonment in the penitentiary.

Appellant was charged in the indictment with the murder of Jack Richey on the 16th day of March, 1895, by striking him on the head with a stick of wood.

Deceased Richey was an old man, between seventy-five and eighty, but quite vigorous. He was a man hard to get along with, quarrelsome, and abusive. About a week or two before the killing, he had driven his wife and young daughter from home. She applied to appellant, who was a prosperous merchant in the city of Sulphur Springs, for work. He had no work for her. She importuned him to let her have a room where she could sew and make a support for herself and child. He inquired as to her character and circumstances, and, finding that she was a hard working, honest woman of good character, and one with whom his own daughter might safely associate, he gave her permission to occupy a portion of one of the rear rooms in his store house. From the time Richey heard of this to the day of the killing, he was unsparing of his abuses of defendant, and, on several occasions, threatened to kill him. On the day of the homicide he passed through defendant's store several times inquiring for him. That day he tried to borrow a pistol with which to shoot him, but failed to get one. He told another party on that day, that he intended to cut the defendant's heart out. His threats were communicated to defendant.

Defendant's store house was a brick building about sixty feet long. On the west of it was the meat market of Hargrove. At the back end of the market, and close to the west wall of defendant's store house,

Hargrove had a barbecue kiln, and the mouth of this kiln was towards the west. Hargrove, who was a witness for the State, gave the following statement as to the killing, viz.: "About noon, that day, I went out at the back door of my market house, and went to my horse that was hitched there, and untied him and threw the reins over his head and started to get on him, when I heard some one cursing and looked around and saw defendant and Richey standing at the southwest corner of defendant's house; defendant was at the corner of the house and Richey was standing facing him about six or eight feet west of him. The first words I heard was Richey cursing defendant; calling him a God damned rascally son-of-a-bitch. Defendant was telling Richey to go off, and was motioning him off with his hand. Richey started towards the barbecue kiln, and was cursing and abusing defendant all the time. Defendant also walked along to the east and a little in the rear of Richey—still telling him (Richey) to go away and not to bother him any more. They were walking slowly; when Richey got near the mouth of the kiln, he turned to the northwest and took a step or two and then turned angling towards defendant, who had reached the kiln, and stopped and said to defendant: "You are a God damned son-of-a-bitch, and I intend to kill you," at the same time placing his right hand somewhere about his right pants pocket. Defendant said: "That's more than I can take, and I'll see that you don't do that," and he stooped down and picked up a stick, the end of which was projecting about a foot out of the mouth of the kiln. As he raised up with the stick, he struck Richey across the side of the head. He did not strike over handed, but struck up as he raised up with the stick, and struck with both hands. Richey turned his head towards the northwest again as defendant raised up with the stick. Richey fell when he was struck. Defendant struck only once, and did not attempt to strike again. There was nothing to prevent his striking again. From the time defendant stooped to pick up the stick until he struck Richey, was only a second or two. It was all done before anything could be done. When the blow was struck, defendant threw down the stick and went back into his house. The stick was about three and one-half or four feet long, and two or two and one-half inches in diameter, and was a part of a seasoned rail, and would weigh three or four pounds. When defendant stooped to pick it up, only about a foot of it was visible, the rest was in the kiln. Richey was unconscious from the time he was struck. He lived about an hour and a half." There is little, if any, difference in the testimony of the other witnesses as to the facts attendant upon the killing. Richey lay where he fell until a doctor came. When he was turned over, a barlow knife, with a blade about three inches long, was found under his body. The knife was not opened, but closed, when found. The witnesses both for the State and the defendant testified to the exceptionally good character of defendant.

The following are defendant's special requested instructions, as to the intent and means used, which were refused by the court, viz:

1.  "If the jury believe from the evidence that defendant struck Jack Richey a blow that resulted in the death of Richey, and that at the time he did so, he was under the influence of sudden passion, and that he did not intend to kill Richey; and, that the stick with which the blow was struck was not in its nature calculated to produce death; or, if you have a reasonable doubt as to whether such facts existed, then you should acquit defendant of murder and manslaughter, and in such case, you may find him guilty of aggravated assault and battery, the punishment for which offense is by fine not less than $25 nor more than $1000, and by imprisonment in the county jail not less than one month nor more than two years, or by such fine without imprisonment."

2.  "If the jury believe from the evidence that defendant struck Jack Richey a blow that resulted in the death of Richey, and that at the time he did so, he was under the influence of sudden passion, and, that he did not intend to kill Richey, and that he believed the stick with which the blow was struck was not in its nature calculated to produce death, or if you have a reasonable doubt as to whether such facts existed, then you should acquit defendant of murder and manslaughter, and this would be the case even though the stick was, in its nature, calculated to produce death, provided the want of knowledge of such fact on defendant's part was not due to his negligence, carelessness or disregard of human life, and in the event you so find, you may convict defendant of aggravated assault and battery, and assess his punishment at a fine not less than $25 nor more than $1000, and by imprisonment in the county jail not less than one month nor more than two years, or by such fine without imprisonment."

3.  "If the jury believe from the evidence that the defendant struck Jack Richey a blow that resulted in the death of Richey, and that there was no apparent intention on his part to kill, and that he did not intend to kill the said Richey, and that there was no apparent danger of causing the death of said Richey, or if you have a reasonable doubt as to whether such facts existed, then you should acquit defendant of murder and manslaughter, and in such case you may convict him of negligent homicide of the second degree, the punishment for which offense is by imprisonment in the county jail not exceeding three years, or by fine not exceeding $3000."

· *M. B. Morris, D. Thornton* and *Templeton & Crosby,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HURT, Presiding Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of six years, and he appeals to this court. But one question is presented which we desire to notice. To constitute murder of either degree, must the accused intend to kill? When the accused, in the perpetration of a felony, kills another, the intent to

kill is not necessary. Where the circumstances attending the homicide show an evil or cruel disposition, or that it was the design or intent of the person to kill, he is deemed guilty of murder or manslaughter, according to the other facts of the case, though the instrument or means used may not in thei. nature be such as to produce death ordinarily. This case presents no evil or cruel disposition on the part of the accused. This homicide was not committed in the perpetration of any felony. Under this state of the case, to constitute murder or manslaughter, must the party intend to kill? We answer that he must. In passing upon the intention of the accused—that is, whether he intended to kill the deceased or not—the instrument or means by which the homicide was committed must be taken into consideration. If the instrument or means used be not likely to produce death, we are not permitted to presume that death was designed, unless, from the manner in which it was used, the intent to kill evidently appears. But let us suppose that the instrument be one likely to produce death, the jury may infer therefrom the intention to kill; but still it is a question for the jury as to whether the intention to kill existed or not. It does not follow that, in every killing or homicide committed with an instrument likely to produce death, the intention to kill existed. The fact of the intention to kill must be established. This can be done, however, by the character of the instrument or weapon used. If it is likely to produce death, the jury would be warranted in finding an intention to kill; but, as a matter of law, this is not the case. It is still a question of fact for the jury. The instrument used in this case was a stick of wood or piece of rail, about three or four feet long and about two inches in diameter, and weighing three or four pounds. Now, can the court assume that it was a deadly weapon, and from that assumption infer absolutely the intention to kill, and withhold that question from the jury? We think not. We are of opinion that the court should have submitted this question to the jury. This was not done. Counsel for appellant requested instructions bearing upon this question, which were refused. This, we think, was error, for which the judgment must be reversed, and the cause remanded.

*Reversed and Remanded.*