**Michael Esparza DOMANSKI, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 13–82–097–CR.**

Court of Appeals of Texas,
Corpus Christi.

June 16, 1983.

Discretionary Review Granted
Nov. 30, 1983.

Fred Galindo, Brownsville, for appellant.

Kirk Brush, Reynaldo Cantu, Jr., Dist. Atty., Brownsville, for appellee.

Before BISSETT, UTTER and GONZA-LEZ, JJ.

## OPINION

BISSETT, Justice.

This is an appeal from a conviction for the offense of murder. Appellant pled not guilty. Following a trial to a jury, punishment was assessed at eighteen years'[1] confinement in the Texas Department of Corrections.

Appellant presents eight grounds of error. In grounds one and two, he contends that the evidence is insufficient to support the jury's verdict that he "intentionally and knowingly" caused the death of Carlos Galvan as charged in the indictment. He argues that there is no evidence that he pointed the gun toward the deceased, and, therefore, there is no showing that he either knowingly or intentionally committed the offense of murder. The jury, however, found the necessary intent and found appellant guilty of murder. We are bound by law in a criminal case to view the evidence in the light most favorable to the jury verdict. *Bowers v. State*, 570 S.W.2d 929 (Tex.Cr.App.1978); *Allen v. State*, 651 S.W.2d 267 (Tex.Cr.App., 1983).

Carlos Galvan was killed at about 1:30 a.m., May 31, 1981, in the parking lot of Gomez Grocery Store, located in the Community of El Ranchito in Cameron County, Texas. On May 30, 1981, at about 11:30 p.m., following a round of partying, appellant, who lived in the El Ranchito Community, stopped at the Gomez Grocery Store, where he purchased a six-pack of beer. He then drove around the Community. After consuming the beer, he returned to Gomez Grocery Store sometime after midnight. At that time, the store was closed, but Carlos Galvan and several other people were in the parking lot adjacent to the Store. They were soon joined by several other persons, including Javier Longoria and Noe Leal. All told, there were ten people in the parking lot, including appellant and Carlos Galvan, the deceased. All were drinking beer and "going knee deep"

in their bragging about their respective jobs. Javier Longoria, Noe Leal and the appellant testified at the trial. The other persons present at the scene of the homicide were not called as witnesses by either the State or the appellant.

It is undisputed that all ten of the persons in the parking lot had been drinking beer for some time preceding the killing. It is also undisputed that appellant was drunk when the shooting occurred and was still drunk about an hour or so thereafter, when he made oral statements to deputy sheriffs of Cameron County in the sheriff's office in Brownsville, Texas. A test of the decedent's blood showed .29% alcohol by weight.

Javier Longoria arrived at the parking lot at Gomez Grocery Store at about 1:15 a.m. on May 31, 1981. He, along with some other men, was in a car driven by Noe Leal. About fifteen minutes after their arrival, Longoria heard a shot. He said that immediately following the shot he "looked and saw Carlos (the deceased) falling down." After the shot was fired, he said that he saw appellant "with the gun in his hand and with his head down. And then, I didn't see anything else." At that time, he was about fifteen to twenty feet from appellant, and the deceased, Carlos Galvan, was seven or eight feet away from appellant.

Noe Leal testified that when he, Javier Longoria and the other persons in his car, arrived at the Gomez Grocery Store parking lot, the appellant, the deceased and two other people were there. According to Leal, the deceased was shot twenty or thirty minutes later. During the time that the people in the parking lot were talking and drinking beer, Leal said that he turned around and saw appellant with "a gun in his hand," and "saw some of the other guys try to talk him out of the gun." Leal testified that he "felt like it was my obligation, you know, to try to get it off his hand, you know, before anything could happen." He walked up to appellant and tried to "talk him into lending me the gun." Appellant did not give the gun to him and did not say anything to him. Leal further testified that when he first saw the gun in appellant's hand, the appellant "had it pointed upwards." While he was talking to him, appellant pointed the gun "downwards." The gun was in appellant's right hand. While Leal was trying to talk appellant into giving him the gun, the deceased "started mumbling," and he was "saying something" when the gun "went off." The gun, when it was fired, was six or seven inches from Leal's ear. Appellant was two or three feet from Leal. The shot was fired while Leal was turning his head; he said that he "turned back" and saw the deceased "falling backwards." The gun, which Leal testified that appellant had in his hand immediately following the shooting, was described by Leal as looking "like a forty-five automatic."

Dr. Lawrence Dahm, a pathologist, performed an autopsy on Carlos Galvan. He said that the bullet entered "in the middle of the back of the head" and exited about an inch above and in front of the right ear. Death was virtually instantaneous. He was unable to state the angle which the bullet traveled as it passed through the head of the deceased, but did say that the bullet was rising and was moving to the right. He could not determine the approximate distance that the bullet traveled from the gun until it struck the deceased, but he did say that it was more than eighteen inches, since there were no powder burns on the body of the deceased or on his clothes.

Appellant said that he knew Carlos Galvan only by the name of "Charlie" and had seen him two or three times previously at the Gomez Grocery Store. Appellant admitted that he owned a .38 caliber automatic and that he placed the gun in his belt when he exited his car at the parking lot. He testified that, after his arrival, someone saw the gun and asked to see it. Whereupon, he handed the gun to that person, "probably Baldemore Garcia or Romulo Bedalla." He did not remember having fired the gun, nor did he remember "playing with the gun." According to him, the deceased was six or seven feet away from

him when the gun was fired. He said that he did not see Carlos Galvan fall, but that after he fell "everybody started running." He started running towards his house, which was very near the scene. Suddenly, he remembered that his vehicle had been parked in the parking lot. He returned to the parking lot, observed the deceased on the ground, and "got into my vehicle and went home." He further testified that he dropped the ".38" somewhere between the parking lot and his home. The gun was never found. Upon reaching his house, he called out to his wife, but did not go inside. He told his wife to go to his mother's house. Both then went to appellant's mother's house, which was about 100 feet distant from appellant's house. He told her "to call the sheriff's department, that there was an accident." His uncle arrived at appellant's mother's house and appellant, his mother and his uncle went to the sheriff's office in Brownsville.

Appellant further stated that the .38 caliber automatic in question "looked like a .45"; that he had a clip in it when he arrived at the Gomez Grocery Store parking lot; that the clip held five or six bullets; and that the gun was cocked (with the safety on) when he handed it to someone.

All of the people in the parking lot at the time of the shooting fled the scene immediately after the shot was fired. Only the appellant returned, and he did so for the sole purpose of driving his car home.

Appellant's acquaintance with Carlos Galvan, the deceased, was very slight. Appellant did not remember seeing either Javier Longoria or Noe Leal in the parking lot. He testified that there were no fights, no argument and no scuffling at any time by and between anyone in the parking lot. He further testified that, if he fired the handgun, he did not do so intentionally. He said that he did not see "anybody else fire the handgun." As far as he knew, no one dropped the gun prior to the time it was fired. He also stated that he never pointed the gun at anyone at any time on May 31, 1981.

Appellant, after arriving at the sheriff's office in Brownsville, was interviewed by deputies Perez and Rendon. He was given the "Miranda" warning by the officers. Thereafter, he made an oral statement to them. Deputy Rendon, over appellant's objection, testified:

"He (appellant) said he got in a struggle with Carlos Galvan beside the pickup. And during the scuffle that Carlos Galvan got shot."

Deputy Perez, over appellant's objection, testified:

"He (appellant) advised me he had shot a man at the Gomez store in El Ranchito, that he had struggled with the victim and the gun had gone off."

The above-quoted statements by Deputies Rendon and Perez were admitted into evidence solely for the purpose of impeaching the testimony of appellant. The jury was so advised and were further instructed by the court not to consider the statements "as any truth of the matter they are testifying about."

Andreas Guerra was called as witness for the State. He testified that sometime in May 1981, but before May 31, 1981, he and some other people were "outside" of the "El Ranchito Beer Joint," when appellant, whom he referred to as "Sonny," and some of his friends joined them. He further testified:

"A   We were eating outside, Fajitas, and it was about—approximately about 8:30.

Q   8:30?

A   About 8:30.

Q   In the morning or at night?

A   No, no, night. And then, Sonny and his friend come by there. And we started joking, you know. Well, me and him, we joke. And then, I was standing up. And then he went on back of me. He pulled me a gun in the back.

Q   Then what happened?

A   Then, I told him if he had some fingers to pull that—you know, finger. I know he was not going to do

it. So,—raised up his hand and shoot in the air one—one shot."

\*    \*    \*    \*    \*    \*

Q What happened after he shot this shot?

A I told his friend, you know, to take him home before somebody else do something. So they just left."

\*    \*    \*    \*    \*    \*

Q And two or three other people were there?

A There were a lot of them, outside.

Q And everybody knew each other?

A Well, yes. Yes, sir.

Q Everybody was—everybody were friends?

A Well, yes, sir."

Rene Guerra, a witness for appellant, testified that "sometime in May," he was attending a "gathering" at a place where Andreas Guerra and appellant, whom he referred to as "Michael," were present. He further testified:

"Q Please tell us what if anything occurred?

A Well, we were there very shortly. I don't know the man very well. And Michael did. And they were horsing around with a pistol. And Michael did fire a shot in the air.

Q They were playing?

A Playing?

Q Nobody was angry or fighting or anything like that?

A No, sir."

Count One in the indictment, under which appellant was convicted, in pertinent part, reads:

"that Michael Esparza Domanski on or about the 31st day of May, 1981 ... in the County of Cameron, in the State of Texas, did then and there, intentionally and knowingly cause the death of an individual, namely Carlos Galvan by shooting him with a firearm."

The court's charge on Count One reads:

"1.

Our law provides that a person commits the offense of murder if he intentionally or knowingly causes the death of an individual.

2.

A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

'Firearm' means any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use.

3.

Now if you find from the evidence beyond a reasonable doubt that on or about the 31st day of May, 1981, in Cameron County, Texas the Defendant, Michael Esparza Domanski, did intentionally or knowingly cause the death of an individual, Carlos Galvan, by shooting him with a firearm, as set forth in Count 1 of the indictment, then you will find the Defendant guilty of murder.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt as to whether Defendant is guilty of murder, as set forth in Count 1 of the indictment, then you will acquit him and next consider whether the Defendant is guilty of the lesser included offense of involuntary manslaughter."

▮ A culpable mental state (by appellant) of "intentionally and knowingly"

causing the death of Carlos Galvan by shooting him with a firearm, is an essential element of the offense of murder as charged in the indictment. Failure to prove that element beyond a reasonable doubt will not support the verdict rendered in the instant case. See *West v. State,* 567 S.W.2d 515 (Tex.Cr.App.1978).

Intent is by nature largely subjective, and may be inferred from the circumstances surrounding the commission of the offense for which a defendant is convicted. *Williams v. State,* 537 S.W.2d 936 (Tex.Cr. App.1976). Therefore, while every case of murder presents a different factual situation, in every such case the State must establish the existence of intent to kill, which intent may be inferred by the mode of killing, whether by a firearm which is deadly per se, or the manner in which a weapon other than a firearm is used. In the instant case, the *mere possession* of the .38 automatic by appellant does not, of itself, establish the requisite intent that appellant "intentionally and knowingly" caused the death of Carlos Galvan by shooting him with a firearm.

A careful reading of the testimony of Longoria, Leal and appellant, the only persons who related the events and described the circumstances immediately preceding the shooting, shows that all of the persons in the parking lot at the time of the homicide were having a good time. They were all friends, and most, if not all, lived in the area of the El Ranchito Community. Their principal social activity consisted of getting together from time to time at Gomez Grocery Store.

It can be inferred from the evidence that the bullet which struck and killed Carlos Galvan was fired from a .38 caliber automatic pistol, which was owned by appellant and was on his person at the parking lot preceding the shooting. It can be inferred from the evidence that the pistol was in appellant's hand at the time it was fired. It can also be inferred from the evidence that the pistol was pointed at the deceased at the time it "went off."

In *Baylor v. State,* 151 Tex.Cr.R. 365, 208 S.W.2d 558 (1948), it was said: "It is well settled that when the weapon used in effecting an unlawful killing is a deadly weapon, per se, the intent to kill is presumed, as a matter of law."

A pistol such as was used in this case is a deadly weapon per se. *Scott v. State,* 617 S.W.2d 691 (Tex.Cr.App.1981); *Williams v. State,* 567 S.W.2d 507 (Tex.Cr.App.1978); *Jackson v. State,* 548 S.W.2d 685 (Tex.Cr. App.1977). "The intent to commit murder may be proved by showing the use of a deadly weapon." *Thompson v. State,* 521 S.W.2d 621, 622 (Tex.Cr.App.1974).

This case is very similar on the facts to those in *Martin v. State,* 626 S.W.2d 928 (Tex.App.—Fort Worth 1982, d.r. ref'd). Under the circumstances in that case, the appellant was convicted of murder. Applying the same logic and reasoning set forth in *Martin* to this case, we hold that, since the presumption of intent to kill as a result of the use of a deadly weapon was not rebutted, there is sufficient evidence to show that appellant intentionally committed the offense of murder. Accordingly, appellant's first and second grounds of error are overruled.

In his third ground of error, appellant asserts that the verdict of the jury is not supported by the evidence because the State failed to prove the identity of Carlos Galvan. He argues that identity can only be proved by the testimony of relatives or through documentary evidence. We do not agree. Appellant, in his brief, says: "It is true that an individual known by some witnesses 'as Carlos Galvan' or 'Charlie Galvan' was shot and killed at El Ranchito, Cameron County, Texas, on May 31, 1981." The record bears out that statement. Several witnesses so testified. The third ground of error is overruled.

Appellant's fourth ground of error is not briefed. Therefore, nothing is presented for review. The ground of error is overruled. See TEX.CODE CRIM.PRO. ANN. art. 40.09 § 9 (Supp.1982).

Appellant, in the fifth and sixth grounds of error, contends that the court erred in permitting two police officers to testify, over his objection, to oral conversation with appellant while in custody and without reducing the same to writing. We do not agree. The testimony complained of by appellant consisted of the testimony of two Deputy Sheriffs of Cameron County, hereinbefore noted, which concerns prior inconsistent oral statements made by appellant. Such testimony was offered by the State solely for the purpose of impeachment. The evidence was admissible. TEX. CODE CRIM.PRO.ANN. art. 38.22 § 5 (1979). See *Girndt v. State*, 623 S.W.2d 930 (Tex.Cr.App.1981). Appellant's fifth and sixth grounds of error are overruled.

Appellant, in his seventh ground of error, asserts that the court erred in permitting the witness Abel Perez to testify, over appellant's objection, that appellant's reputation in the community as a peaceful and law-abiding citizen was bad. We need not discuss the facts relating to the admissions of such testimony at the punishment stage of the trial. There was other evidence before the jury concerning the reputation in the Community of appellant as to whether he was a peaceful and law-abiding citizen. Even if the admission of the testimony of the witness Perez was error, the error was harmless as the same testimony was presented to the jury through the witness Roy Zepeda, a Deputy Sheriff of Cameron County, Texas. Zepeda's testimony was admitted without objection. Appellant's seventh ground of error is overruled.

The appellant, in his eighth ground of error complains that the punishment of eighteen years' confinement in the Texas Department of Corrections was excessive. We do not agree. Murder is a felony of the first degree. TEX.PENAL CODE ANN. § 19.02 (1974). A first degree felony is punishable by any term of years not less than five years nor more than ninety-nine years, or life. TEX.PENAL CODE ANN. § 12.32 (1974). Eighteen years, as assessed in this case, is within the statutory range and is legally proper. *Nunez v. State*, 565 S.W.2d 536 (Tex.Cr.App.1978); *Ransonnette v. State*, 522 S.W.2d 509 (Tex. Cr.App.1975), appeal dismissed, cert. denied, 423 U.S. 941, 96 S.Ct. 350, 46 L.Ed.2d 274). Appellant's eighth ground of error is overruled.

The judgment of the trial court is AFFIRMED.