# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SIRRON BENSON, | § | |
| | § | |
| Defendant-Below, | § | No. 380, 2013 |
| Appellant, | § | |
| | § | Court Below: |
| v. | § | Superior Court of the State |
| | § | of Delaware, in and for |
| STATE OF DELAWARE, | § | New Castle County |
| | § | Cr. I.D. 1107007485 |
| Plaintiff-Below | § | |
| Appellee. | § | |

Submitted: October 15, 2014
Decided: December 1, 2014

Before **HOLLAND**, **RIDGELY**, and **VALIHURA**, Justices.


Upon appeal from the Superior Court of the State of Delaware.
**AFFIRMED.**

Peter W. Veith, Esquire, Wilmington, Delaware, Attorney for Defendant-Below, Appellant.


Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware, Attorney for Plaintiff-Below, Appellee.


**HOLLAND**, Justice:

This is an appeal from a final judgment of convictions that was entered by the Superior Court. Following a six-day trial, a jury convicted Sirron Benson ("Benson") of Murder First Degree and Possession of a Firearm During the Commission of a Felony in connection with the July 3, 2011 shooting death of Braheem Curtis. Benson was sentenced to a term of life imprisonment as to Murder First Degree and twenty years at Level V to be served consecutively as to Possession of a Firearm During the Commission of a Felony.

Benson raises two issues in this direct appeal. First, Benson contends that it was plain error for the trial judge not to issue a curative instruction *sua sponte* when the prosecutor, in his rebuttal summation, stated that Benson's intent to cause death could be inferred from the weapon used to perpetrate the crime. Second, Benson submits that the trial judge committed reversible error by failing to give a cautionary instruction relating to the testimony of an informant witness who was receiving a benefit from the State in exchange for his testimony.

We have concluded that neither of Benson's arguments has merit. Therefore, the judgment of the Superior Court must be affirmed.

### *Facts*[1]

On July 3, 2011, people were congregating outside in the area of Ninth and Kirkwood Streets on the east side of Wilmington. They were conversing with one

---

[1] This factual recitation is taken from Benson's Opening Brief.

another and setting off fireworks in anticipation of the upcoming July Fourth holiday. Among those gathered were Benson; decedent Braheem Curtis ("Curtis"); Donnie Stephens; Barbara Stephens; Shirl Williams; and Shelly Cannon. In the midst of the fireworks being set off, an argument erupted between Benson and Curtis. In the course of the argument, Benson told Curtis to stop with the fireworks or else he would go and "get [his . . .] gun."

Following the argument, Benson, who was wearing blue jeans and a white t-shirt, left the area walking up Ninth Street toward his residence. Benson's argument with Curtis and his departure was observed by numerous bystanders who were also gathered nearby. Shortly after leaving the area, Benson returned, raised his arm and fired a single shot at Curtis causing him to fall to the ground. Benson continued walking toward Curtis and fired a second shot at him while he lay on the ground. After firing the second shot, Benson continued walking up Ninth Street toward Lombard Street where he discarded the weapon.

Robin Unthank, who resides at 810 Lombard Street, reported to police that she observed an individual wearing blue jeans and a white t-shirt run past her residence and throw a black object that appeared to be a gun up onto the roof. Unthank's report came in shortly after the reported shooting of Braheem Curtis. Sergeant Hauk of the Wilmington Police Department responded and recovered a .45 caliber Ruger Blackhawk revolver from the roof of Unthank's residence.

3

As Benson and Curtis argued, a bystander had called 911 to complain about the fireworks. A patrol unit was dispatched to respond to the fireworks complaint. Immediately after the shooting, a bystander flagged down an officer who was on patrol and reported the shooting at Ninth and Kirkwood. Officer Malloy of the Wilmington Police Department arrived on scene to find Braheem Curtis laying on the ground, unresponsive, and suffering from an apparent gunshot wound to the chest. Officer Malloy provided first aid until Emergency Medical Services arrived.

Upon arrival, Emergency Medical Services placed Curtis into an ambulance and transported him to Christiana Hospital, where he was later pronounced dead from a gunshot wound to the chest. While undergoing treatment at Christiana Hospital, a single projectile was recovered and turned over to the Office of the Chief Medical Examiner. Curtis' body and personal effects were transferred to the Office of the Chief Medical Examiner where an autopsy was conducted. In the course of the autopsy, a second projectile was recovered from Curtis' chest cavity.

The Medical Examiner's autopsy revealed Curtis' cause of death to be exsanguination caused by a gunshot wound to the thoracic aorta. Benson was subsequently arrested and charged with the Curtis' death. He was later indicted for intentional Murder First Degree and Possession of a Firearm During the Commission of a Felony.

At trial, the State called Barbara and Donnie Stephens, Shirl Williams and Shelly Cannon as eye witnesses. Each witness testified that they were out in the area of the shooting on the right in question, and that they observed the events as they occurred. Each witness also testified that they were familiar with Benson from the neighborhood, that he was wearing blue jeans and a white t-shirt on the night in question, and that he was in fact the individual who shot Curtis. The State also introduced testimony of investigating and responding police officers; responding EMS personnel; DNA experts; a ballistics expert; Benson's former cellmate; and the pathologist who performed the autopsy on Curtis.

The State's ballistics expert, Carl Rone ("Rone") testified that the projectiles recovered from Curtis' body were fired from a .45 caliber pistol. He further testified that the weapon from which the bullets were fired had conventional, right-twist rifling. Rone's testimony also established that the weapon recovered from the rooftop of 810 Lombard was a .45 caliber revolver that had conventional, right-twist rifling and that the recovered projectiles were consistent with being fired from this type of weapon. Rone further testified, however, that the recovered projectiles were too damaged to be tested to the degree necessary to determine that they had been fired from the recovered weapon. At no time during the State's case-in-chief did it establish the lethality of the recovered weapon versus that of other weapons, nor did it establish that Benson had other firearms available to him.

5

During its case-in-chief, the State also called David Lawhorn ("Lawhorn") to testify as to the substance of conversations that he had with Benson while the two were incarcerated together. Lawhorn and Benson were cellmates between January and August 2012. At the time of Benson's trial, Lawhorn had pleaded guilty to multiple burglaries and had been sentenced. Lawhorn testified that Benson had confessed to having shot and killed Curtis, discarding the gun on a nearby rooftop, and fleeing to a nearby apartment complex and later to Dover. Lawhorn acknowledged that his testimony for the State at Benson's trial was in exchange for the later filing of a substantial assistance motion from which Lawhorn stood to benefit.

In its summation, the defense argued that the evidence was not sufficient to prove that Benson had the requisite intent to sustain a verdict of guilty of Murder First Degree. The defense argued that in light of Benson's youth and impulsiveness, and the inconclusiveness of the physical evidence, that the only homicide offenses that could be sustained by the evidence were Murder Second Degree, Manslaughter or Criminally Negligent Homicide. All of these offenses required a lesser mental state than intent.

In its rebuttal summation, the State argued, *inter alia*, that the size of the gun and bullets involved in the shooting were proof that Curtis was intentionally killed. The prosecutor also mentioned that a witness had testified that Curtis was writhing

about on the ground when Benson shot him a second time, an assertion Benson now submits was not supported by the testimony or evidence. Benson's trial attorney did not object to the State's remarks when they were made and the trial judge did not intervene *sua sponte*.

Following the closing arguments, the Superior Court issued its final instructions to the jury. Those jury instructions informed the jury of the necessary elements which must be proven to sustain guilty verdicts for the indicted offenses as well as the lesser included offenses. The jury instructions also set forth the burdens of proof and informed the jury that questions and remarks by counsel were not evidence and that deliberations should only consider witness testimony and the evidence that was admitted at trial. Following two and a half hours of deliberation, the jury returned verdicts of guilty as to Murder First Degree and Possession of a Firearm During the Commission of a Felony.

### *Prosecutor's Closing Comments*

Benson's first argument is that in the State's rebuttal closing argument, the prosecutor made impermissible inflammatory remarks stating his own opinion regarding Benson's intent to kill based upon the size of the firearm. There was no objection to those remarks by Benson's trial attorney. This Court reviews claims

of prosecutorial misconduct to which there was no such objection at trial for plain error.[2]

In applying the plain error standard, this Court will first review the record *de novo* to determine whether prosecutorial misconduct has in fact occurred.[3] If the Court finds no error, the analysis ends.[4] If, however, the Court finds the prosecutor erred, the Court applies the *Wainright* standard,[5] under which, "plain error is limited to material defects which are apparent on the fact of the record; which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[6]

In order to prove that Benson was guilty of First Degree Murder, the State was required to prove that he intentionally killed Curtis. Intent must usually be inferred from the actions of the perpetrator.[7] The intent necessary for First Degree Murder may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately

---

[2]*Baker v. State*, 906 A.2d 139, 151 (Del. 2006) ("[W]here defense counsel fails to raise *any* objection at trial to allege prosecutorial misconduct and the trial judge fails to intervene *sua sponte*, we review claims of prosecutorial misconduct on appeal for plain error." (emphasis in original))).

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citations omitted).

[7] *Brown v. State*, 233 A.2d 445, 447 (Del. 1967).

following the death.[8]  With regard to intent, the trial judge instructed the jury in Benson's case, as follows:

> State of mind.  One element of a criminal offense is the defendant's state of mind.  It is difficult to know what is going on in another person's mind.  Therefore, you are permitted to draw an inference, or reach a conclusion, about the defendant's state of mind based on the facts and circumstances surrounding the act the defendant is alleged to have done.

In addressing Benson's state of mind, the prosecutor commented:

> Because the most important evidence, the proof that leaves you beyond all doubt of his intention came from – look at the size of this gun, a .45 caliber gun.  It's no peashooter, as they say.  It's not a BB gun.  It's not a small gun.  Look at the bullets.  They're in evidence.  Look how big they are.  This is a weapon to kill somebody.  When you shoot somebody one time with a weapon this large, do you think it's their intent – can you infer from that their intent to shoot to kill them?  Absolutely.
>
> But again, that's not all you have here.  Right?  Because he not only shot him.  Because if his conscious object and purpose was to hurt him, he did that with the first shot.  He did that with the first shot.  Braheem went down on the ground.  [ ]  He could have just walked on or ran on or whatever.  But he didn't do that.  Because you

_____

[8] *State v. Diaz*, 679 A.2d 902, 916 (Conn. 1996); *State v. Raguseo*, 622 A.2d 519, 523-24 (Conn. 1993); *State v. Rokus*, 483 N.W.2d 149, 154-55 (Neb. 1992) ("[No one could] argue that a hollow-point bullet fired from a .44 Magnum is not a life-threatening projectile.  Intent to kill may be inferred from deliberate use of a deadly weapon in a manner reasonably likely to cause death."); *Williams v. State*, 804 S.W.2d 346, 347-48 (Ark. 1991); *Parker v. State*, 717 S.W.2d 800, 801 (Ark. 1986); *State v. Hamilton*, 478 So.2d 123, 128-29 (La. 1985); *Domanski v. State*, 665 S.W.2d 793, 798 (Tex. Ct. App. 1983) (stating that every case of murder presents a different factual situation where the State must establish the existence of intent to kill which may be inferred by the mode of killing, whether by a firearm that is deadly *per se*, or the manner in which a weapon other than a firearm is used).

remember what the testimony was. He shot him. And when he was down, he made sure he was going to kill him because he points down and shoots him again. And how is that not intent to kill somebody?

In closing argument, a prosecutor "is allowed and expected to explain all the legitimate inferences of the [defendant's] guilt that flow from [the] evidence."[9] The size of the weapon in this case was a fact in evidence which the jury could logically consider in its deliberation. In *Johnson v. State*,[10] the Texas Court of Appeals considered whether a knife could be used as a deadly weapon and determined that, although a knife may not be a deadly weapon *per se*, a jury may consider all of the facts of the case, "and the State can prove, even without expert testimony, that a particular knife is a deadly weapon by showing its size, shape, sharpness, the manner of its use, and its capacity to produce death or serious bodily injury."[11]

In Benson's case, the prosecutor argued an inference that could be logically drawn from the evidence - a large gun and bullets is circumstantial evidence of Benson's intangible intent to kill. The prosecutor's argument referred to the physical evidence, including the size of the gun and the bullets. Those items were admitted into evidence and reviewable by the jury, which was free to accept or reject the prosecutor's argument. The record reflects that the prosecutor's closing

[9] *Hooks v. State*, 416 A.2d 189, 204 (Del. 1980).
[10] 919 S.W.2d 473 (Tex. Ct. App. 1986).
[11] *Id.* at 477.

comments in Benson's case were not improper. Accordingly, there was no plain error.

## *Jury Instructions*

Benson's second argument is that by failing to instruct the jury that they should treat the testimony of a jailhouse informant, David Lawhorn, with "great care and caution," the trial judge committed reversible error. There was no objection at trial to the jury instructions that were given. Therefore, this argument is also reviewed for plain error.

Lawhorn testified that from January through August 2012, while he was incarcerated at Howard R. Young Correctional Facility for pending burglary charges, he was Benson's cellmate. Lawhorn testified that Benson told him that on July 3, 2011, he and a bunch of friends were partying and shooting off fireworks on Kirkwood Street when he got into an argument with Curtis. Benson said he was going to go home and get his gun, but his friends talked him out of it. Benson left, but returned and got a .45 caliber revolver from one of "his boys" and shot across the street, hitting Curtis in the chest. When Curtis grabbed his chest and fell to the ground, Benson ran to him and shot him again and then left, throwing the gun onto a rooftop as he ran towards Bethel Villa. From there, Benson's brother, Lovey, took him to Dover.

11

In his direct testimony, Lawhorn stated that prior to testifying, he had pled guilty to multiple burglary charges and received a four and half year sentence and had a prior conviction for Robbery First Degree. Lawhorn also acknowledged that in return for his agreement to testify truthfully against Benson he understood that he would receive substantial assistance from the State in reducing his sentences. On cross-examination, Benson reviewed with Lawhorn his prior convictions for burglary and robbery, the basis of his knowledge and his motivations for testifying.

During the prayer conference, the parties discussed Lawhorn's testimony. The trial judge noted that she would give the "witness' conviction for a crime" instruction in light of Lawhorn's testimony. Benson's counsel also told the trial judge that he was unable to find and was unaware of a "super-duper cautionary instruction" similar to the accomplice liability instruction in *Bland v. State*[12] that would apply to Lawhorn's informant testimony. Benson's counsel stated that he was bringing the issue up "just to make sure [he was] not missing something."

The trial judge responded that counsel was free to submit an instruction for consideration. The State commented that the "credibility of witnesses'" instruction already informed the jury to consider the motivation for a witness' testimony. The record reflects that Benson's counsel did not submit a follow-up instruction and

---

[12] 263 A.2d 286, 288-89 (Del. 1970).

did not object to the instructions that were given. As to the credibility of the witnesses, the Superior Court instructed the jury as follows:

> You are the sole judges of the credibility of witnesses and of the weight to be given to their testimony. You are to judge the credibility of all of the witnesses who have testified before you. And police officers are witnesses just like anybody else, and you should judge their credibility, just as you would any other witness.
>
> For each witness, you may consider the following factors: the circumstances under which the witness obtained the knowledge, the strength of memory, the opportunity for observation, their reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motivations of the witness, whether the testimony has been contradicted, whether the witness has any bias or prejudice or interest in the outcome of the case, the manner or behavior or demeanor of the witness on the witness stand, the apparent truthfulness of the testimony, and all other facts and circumstances shown by the evidence that may affect the credibility of the testimony.

The Superior Court also instructed the jury that, in making a determination regarding conflicts in testimony, to consider the witness' demeanor or behavior, the reasonableness of the testimony, "the witness' opportunities for learning and knowing the facts about which they testify, and any prejudice or interest they may have concerning the outcome of the case" The jury was further instructed that a witness' conviction for a crime of dishonesty could be considered for judging the credibility of that witness.

13

The record reflects that Benson's trial attorney emphasized to the jury Lawhorn's reasons for testifying and expounded upon them in closing argument:

> We know what David Lawhorn is. He's a convicted robber, serial burglar. He's been sentenced to four and a half years in jail. And now he comes into court and he's got a deal with the State. Come in and tell you what you allegedly heard the defendant tell you. And the State, the Department of Justice, will file a motion with the judge. And the judge will make a decision about whether he cuts David Lawhorn a break. How credible or trustworthy is that type of person on the stand that has an ulterior motive to come forward? He didn't come forward when he first heard the defendant allegedly tell him this stuff.

Benson now argues on appeal that the jury should have been given an instruction in accordance with the Third Circuit's Pattern Jury Instruction for informant witnesses. Benson acknowledges, however, that an informant witness instruction is not required in all cases. In fact, the case that Benson cites to support his argument on appeal, *United States v. Isaac*,[13] did not require such an instruction.[14]

"As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law."[15] "A trial court's jury charge will not serve as grounds for reversible error if

---

[13] 134 F.3d 199 (3d Cir. 1998).
[14] *Id.* at 205.
[15] *Smith v. State*, 913 A.2d 1197, 1241 (Del. 2006); (quoting *Bullock v. State*, A.2d 775 A.2d 1043, 1047 (Del. 2001); *Floray v. State*, 720 A.2d 1132, 1138 (Del. 1998)); *see also Flamer v. State*, 490 A.2d 104, 128 (Del. 1983).

it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.'"[16] Therefore, as long as the trial judge's jury instruction was legally correct, the fact that it differed from Benson's current desired instruction, which was not requested at trial, is irrelevant.[17]

Benson's jury was given the pattern instruction on the credibility of witnesses, conflicts in testimony and witness' conviction of a crime. The jury instructions that were given adequately guided the jury as trier of fact and determiner of credibility and enabled the jury to perform its duty. The record reflects no plain error.

### *Conclusion*

The Superior Court's judgment of convictions is affirmed.

---

[16] *Bullock*, 775 A.2d at n. 47; (quoting *Baker v. Reid*, 57 A.2d 103, 109 (Del. 1947)).
[17] *See Grace v. State*, 658 A.2d 1011, 1014 (Del. 1995).