FILED IN
COURT OF CRIMINAL APPEALS

December 3, 2015

ABEL ACOSTA, CLERK

AP-77,045
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/3/2015 7:16:03 AM
Accepted 12/3/2015 7:54:11 AM
ABEL ACOSTA
CLERK

# AP-77,045-CR

In The
Court of Criminal Appeals
Austin, Texas

---

HARLEM HAROLD LEWIS, III,
Appellant

vs.

THE STATE OF TEXAS,
Appellee

---

On Appeal in Cause 1428102
351ST District Court
Hon. Mark Kent Ellis, Judge Presiding

---

# BRIEF FOR APPELLANT

---

**Oral Argument Requested**
**Pursuant to Rule 39.1, 39.7**
**Texas Rules of Appellate Procedure**

GERALD E. BOURQUE
Appointed Counsel for Appellant

Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
PHONE: (281) 379-6901
FAX: (832) 813-0321
TBL #02716500

## IDENTITY OF PARTIES AND COUNSEL

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

(a.)   Harlem Harold Lewis, III, Appellant

(b.)   Patrick F. McCann, 909 Texas Avenue, Suite 205, Houston, TX, 77002, Tyronne C. Moncriffe, 1314 Texas Avenue, Suite 1112, Houston, TX, 77002, and Amy Martin, 202 Travis Street, Suite 300, Houston, TX 77002, counsel for Appellant at trial

(c.)   Gerald E. Bourque, 24 Waterway Ave., Suite 660, The Woodlands, TX, 77380, counsel for Appellant on appeal

(d.)   Anna L. Emmons, Thomas C. Goodhart, Alan K. Curry, Maria McAnulty, and Devon Anderson, Office of the District Attorney, 1201 Franklin, Houston, TX, 77002, counsel for the State

 /s/ Gerald E. Bourque
GERALD E. BOURQUE
Attorney of Record for Appellant

i

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**POINT OF ERROR NO. ONE**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed intentionally, as required by statute. . . . . 20

**POINT OF ERROR NO. TWO**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed knowingly, as required by statute. . . . . . . 20

**POINT OF ERROR NO. THREE:** The trial court erred in denying Appellant's motion for instructed verdict of not guilty. . . . . . . . . . . . . . . 20

**POINT OF ERROR NO. FOUR:** The trial court abused its discretion by overruling Appellant's objection to the trial court's jury charge which shifted the burden of proof to Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**POINT OF ERROR NO. FIVE:** The trial court abused its discretion by denying Appellant's request for a jury instruction for the lesser included offense of felony murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**POINT OF ERROR NO. SIX:** The trial court erred in allowing an unreasonable amount of peace officers in uniform to appear in the audience denying Appellant due process of law and a fair trial. . . . . . . . . . . . . . . . 39

**POINT OF ERROR NO. SEVEN:** Reversible error occurred when the State was allowed to engage in prejudicial jury arguments which denied Appellant a fair trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**POINT OF ERROR NO. EIGHT:** The cumulative effect of the improper arguments of the prosecutor constituted fundamental error requiring a reversal

of this cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

**POINT OF ERROR NO. NINE:** The trial court abused its discretion in allowing the State to present victim impact testimony in the guilt/innocence phase of the trial over Appellant's objection. . . . . . . . . . . . . . . . . . . . . . . . 52

**POINT OF ERROR NO. TEN:** The trial court erred in denying Appellant's motion for a mistrial and allowing a victim's family member to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented. 52

**POINT OF ERROR NO. ELEVEN:** The trial court erred in denying Appellant's request to remove a family member of the victim from the courtroom, and allowing her to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented. . . . . . . . . . . . . . . . . . . . . . . . 52

**POINT OF ERROR NO. TWELVE:** The evidence was insufficient to support an affirmative finding to the special issue in the punishment phase regarding future dangerousness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**POINT OF ERROR NO. THIRTEEN:** The evidence was insufficient to support the negative answer to the special issue regarding mitigating circumstances to warrant a life sentence rather than death. . . . . . . . . . . . . 62

**POINT OF ERROR NO. FOURTEEN:** The trial court erred in admitting evidence of extraneous offenses allegedly committed by Appellant as the prejudicial effect of the extraneous acts outweighed any probative value, and the introduction thereof was reversible error.. . . . . . . . . . . . . . . . . . . . . . 67

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

# INDEX OF AUTHORITIES

**CASES**                                                                       **PAGE**

*Abdnor v. State,* 871 S.W.2d 726 (Tex. Crim. App. 1994) . . . . . . . . . . . . . . . . . 71

*Albrecht v. State,* 486 S.W.2d 97 (Tex. Crim. App. 1972) . . . . . . . . . . . . . . 68, 61

*Almanza v. State,* 686 S.W.2d 157 (Tex. Crim. App. 1984) . . . . . . . . 29, 37, 70, 71

*Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Autry v. State,* 264 S.W.2d 735 (Tex. Crim. App. 1954) . . . . . . . . . . . . . . . . . . 67

*Baker v. State,* 781 S.W.2d 688 (Tex. App.-Ft. Worth 1989) . . . . . . . . . . . . . . 71

*Bell v. State*, 724 S.W.2d 780 (Tex. Crim. App.1986) . . . . . . . . . . . . . . . . . . . . 48

*Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) 64

*Boutwell v. State,* 719 S.W.2d 164 (Tex. Crim. App. 1985) . . . . . . . . . . . . . . . . 71

*Brown v. State,* 122 S.W.3d 794 (Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . 29

*Burks v. United States,* 437 U.S. 1, 98 S. Ct 2141, 57 L. Ed.2d 1(1978) . . . . . . . 27

*Campbell v. State,* 149 S.W.3d 149 (Tex. Crim. App.2004) . . . . . . . . . . . . . 31, 48

*Canales v. State,* 98 S.W.3d 690 (Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . 26

*Chamberlain v. State,* 998 S.W.2d 230 (Tex. Crim. App. 1999) . . . . . . . . . . . . . 50

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) . . . . 36

*Clarke v. State,* 785 S.W.2d 860 (Tex. App.-Fort Worth 1990) . . . . . . . . . . . . . 48

*Coffin v. United States,* 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895) . . . . . 30

*Collier v. State,* 999 S.W. 2d (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . 27

*Couret v. State,* 792 S.W.2d 106 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . . . . 68

*Crank v. State,* 761 S.W.2d 328 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . 68

*Davis v. State,* 329 S.W.3d 798 (Tex. Crim. App. 2010) . . . . . . . . . . . . . . . . . 58

*Deck v. Missouri,* 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005) . . . . . 30

*Dewberry v. State,* 4 S.W.3d 735 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . 22

*Domanski v. State,* 665 S.W.2d 793 (Tex. App.-Corpus Christi 1983) . . . . . 21, 22

*Duncantell v. State,* 877 S.W.2d 859 (Tex. App. – Beaumont 1994) . . . . 68, 69, 70

*Estelle v. Williams,* 425 U.S. 501, 96.Ct. 1691, 48 L. Ed. 2d 126 (1976)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L. Ed. 2d 543 (1965) . . . . . . . . 42

*Evans v. State,* 781 S.W.2d 376 (Tex. App. - Houston [14th Dist.] 1989) . . . . . . 33

*Ex parte Watson,* 306 S.W.3d 259 (Tex. Crim. App. 2009) . . . . . . . . . . . . . . . . 31

*Ferrel v. State,* 55 S.W.3d 586 (Tex. Crim. App. 2001) . . . . . . . . . . . . . . . . . . . 31

*Fitch v. State,* 37 Tex. Crim. 500, 36 S.W. 584 (Tex. Crim. App. 1896) . . . . 21, 26

*Fitzgerald v. State,* 782 S.W.2d 876 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . 68

*Freeman v. State,* 876 P.2d 283 (Okl. Cr. 1994) . . . . . . . . . . . . . . . . . . . . . . . . 59

*Fuentes v. State,* 991 S.W.2d 267 (Tex. Crim. App. 1999) . . . . . . . . . . . . . 35, 36

*Garcia v. State,* 626 S.W.2d 46 (Tex. Crim. App. 1982) . . . . . . . . . . . . . . . . . . . . 63

*Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L. Ed.2d 15 (1978) . . . . . . . . 27

*Haley v. State,* 173 S.W.3d 510 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . 59

*Hall v. State,* 225 S.W.3d 524 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . 31, 33

*Hall v. State,* 158 S.W.3d 470 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . 33

*Harris v. State,* 790 S.W.2d 568 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . 36

*Hayward v. State,* 158 S.W.3d 476 (Tex. Crim. App.2005) . . . . . . . . . . . . . . . . 31

*Hooper v. State,* 214 S.W.3d 9 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . . . . . . 22

*Howard v. State,* 941 S.W.2d 102 (Tex. Crim. App. 1996) . . . . . . . . . . . . . . 41, 42

*Huffman v. State,* 746 S.W.2d 212 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . 63

*In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) . . . . . . . . . 30

*Irving v. State,* 573 S.W.2d 5 (Tex. Crim. App. 1978) . . . . . . . . . . . . . . . . . . . . 47

*Jackson v. State,* 17 S.W.3d 664 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . 22

*Jackson v. State,* 529 S.W.2d 544 (Tex. Crim. App. 1975) . . . . . . . . . . . . . . . . 48

*Jackson v. State,* 506 S.W.2d 620 (Tex. Crim. App. 1974) . . . . . . . . . . . . . . . . 47

*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d.456 (1979) . . 22, 63

*Jacob v. State,* 892 S.W.2d 905 (Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . . 33

*Johnson v. State,* 967 S.W.2d 410 (Tex. Crim. App. 1998) . . . . . . . . . . . . . . . . 50

*Johnson v. State,* 853 S.W.2d 527 (Tex. Crim. App. 1992) . . . . . . . . . . . . . . . . 63

*Jones v. U.S.,* 526 U.S. 227, 119.Ct. 1215, 143 L. Ed. 2d 311 (1999) . . . . . . . . 64

*Jordan v. State,* 646 S.W.2d 976 (Tex. Crim. App. 1983) . . . . . . . . . . . . . . . 48

*Keeton v. State,* 724 S.W.2d 58 (Tex. Crim. App. 1987) . . . . . . . . . . . . . . . . . 63

*Lugo v. State,* 667 S.W.2d 144 (Tex. Crim. App. 1984) . . . . . . . . . . . . . . . . . . 33

*Malik v. State,* 953 S.W.2d 234 (Tex. Crim. App. 1997) . . . . . . . . . . . . . . . . . 23

*Marras v. State,* 741 S.W.2d 395 (Tex. Crim. App. 1987) . . . . . . . . . . . . . . . . 63

*Martinez v. State,* 17 S.W.3d 677 (Tex. Crim. App.2000) . . . . . . . . . . . . . . . . 49

*Matchett v. State,* 941 S.W.2d 922 (Tex. Crim. App. 1996) . . . . . . . . . . . . . 59, 61

*Mathis v. State,* 67 S.W.3d 918 (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . . . 60

*Middleton v. State,* 125 S.W.3d 450 (Tex. Crim. App. 2003) . . . . . . . . . . . . . . 29

*Miller-El v. State,* 782 S.W.2d 892 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . . 60

*Montgomery v. State,* 810 S.W.2d 372 (Tex. Crim. App. 1990) . . . . . . . . . . 58, 61

*Moreno v. State,* 755 S.W.2d 866 (Tex. Crim. App.  1988) . . . . . . . . . . . . . . . 22

*Mosley v. State,* 983 S.W.2d 249 (Tex. Crim. App.1998) . . . . . . . . . . . . . . 49, 60

*Narvaiz v. State,* 840 S.W.2d 415 (Tex. Crim. App. 1992) . . . . . . . . . . . . . 23, 27

*Ovalle v. State,* 13 S.W.3d 774 (Tex. Crim. App. 2000) . . . . . . . . . . . . . . . . . 29

*Payne v. Tennessee,* 501 U.S. 808, 111.Ct. 2597, 115 L. Ed. 2d 720 (1991) . . . . 58

*Peak v. State,* 57 S.W.3d 14 (Tex. App.-Houston [14th Dist.] 2001) . . . . . . . . . 49

*Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 58 S.Ct. 59, 82 L.Ed.2d 43
        (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L. Ed. 2d 256 (1989) . . . 59

*Ring v. Arizona,* 536 U.S. 584, 122.Ct. 2428, 153 L.Ed. 2d 556 (2002) . . . . . . . 64

*Salazar v. State,* 90 S.W.3d 330 (Tex. Crim. App. 2002) . . . . . . . . . . . . . . . 59, 60

*Sandstrom v. Montana* 442 U.S. 510, 99.Ct. 2450, 61 L.Ed.2d 39 (1979)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sermons v. State,* 417 S.E.2d 144 (Ga. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Smith v. State,* 779 S.W.2d 417 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . 63

*Stahl v. State,* 749 S.W.2d 826 (Tex. Crim. App. 1988) . . . . . . . . . . . . . . . . . . . 50

*State v. Atwood,* 832 P.2d 593 (Az. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*State v. Gentry,* 888 P.2d 1105 (Wash. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*State v. Metz,* 887 P.2d 795 (Or. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Stavinoha v. State,* 808 S.W.2d 76 (Tex. Crim. App. 1991) . . . . . . . . . . . . . . . . 59

*Stephens v. State,* 806 S.W.2d 812 (Tex. Crim. App. 1990) . . . . . . . . . . . . . . . . 32

*Sweeten v. State,* 693 S.W.2d 454 (Tex. Crim. App. 1985) . . . . . . . . . . . . . . . . 67

*Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L. Ed. 2d 468 (1978)
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Threadgill v. State,* 146 S.W.3d 654 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . 35

*Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 221, 72 L. Ed. 2d 652 (1982) . . . . . . . 27

*Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 592, 2 L.Ed.2d 630 (1958) . . . . . . . . . . . . 65

*Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985) . . . . 29

*Walters v. State,* 247 S.W.3d 204 (Tex. Crim. App. 2007) . . . . . . . . . . . . . . 58, 61

*Warren v. State,* 562 S.W.2d 474 (Tex. Crim. App. 1978) . . . . . . . . . . . . . . . . 63

*Weeks v. Commonwealth,* 450 S.E.2d 379 (Va. 1994) . . . . . . . . . . . . . . . . . . . 59

*Wesbrook v. State,* 29 S.W.3d 103 (Tex. Crim. App. 2000) . . . . . . . . . . . . . 36, 37

*Williams v. State,* 537 S.W.2d 936 (Tex. Crim. App. 1976) . . . . . . . . . . . . . 21, 26

*Woodson v. North Carolina* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Young v. State,* 137 S.W.3d 65 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . 49

# AP-77,045-CR

In The
Court of Criminal Appeals
Austin, Texas

_____

HARLEM HAROLD LEWIS, III,
Appellant

vs.

THE STATE OF TEXAS,
Appellee

**_____**

On Appeal in Cause 1428102
351ST District Court
Hon. Mark Kent Ellis, Judge Presiding

**_____**

# BRIEF FOR APPELLANT

TO THE HONORABLE COURT:

Harlem Harold Lewis, III, defendant in Cause Number 1428102in the 351st

District Court, Harris County, Texas, Hon. Mark Kent Ellis, Judge Presiding, and

Appellant before the Court of Appeals, respectfully submits this brief to the Court for

the purposes of appealing his conviction of capital murder.

## STATEMENT OF THE CASE

Appellant was indicted by a Harris County grand jury for the offense of capital murder. (C.R. I-2). Appellant plead not guilty, and trial was to a jury. (R.R. XXIV-9). Following the presentation of evidence, and following arguments of counsel and deliberations, the jury found Appellant guilty of capital murder as charged in the indictment. (R.R. XXVIII-85-86). After the presentation of punishment evidence, and after further arguments of counsel and deliberations, the jury found the special issues adversely to Appellant, and the trial court sentenced Appellant to death. (R.R. XXXV-6).

# ISSUES PRESENTED

**POINT OF ERROR NO. ONE**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed intentionally, as required by statute.

**POINT OF ERROR NO. TWO**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed knowingly, as required by statute.

**POINT OF ERROR NO. THREE:** The trial court erred in denying Appellant's motion for instructed verdict of not guilty.

**POINT OF ERROR NO. FOUR:** The trial court abused its discretion by overruling Appellant's objection to the trial court's jury charge which shifted the burden of proof to Appellant.

**POINT OF ERROR NO. FIVE:** The trial court abused its discretion by denying Appellant's request for a jury instruction for the lesser included offense of felony murder.

**POINT OF ERROR NO. SIX:** The trial court erred in allowing an unreasonable amount of peace officers in uniform to appear in the audience denying Appellant due process of law and a fair trial.

**POINT OF ERROR NO. SEVEN:** Reversible error occurred when the State was allowed to engage in prejudicial jury arguments which denied Appellant a fair trial.

**POINT OF ERROR NO. EIGHT:** The cumulative effect of the improper arguments of the prosecutor constituted

3

fundamental error requiring a reversal of this cause.

**POINT OF ERROR NO. NINE:** The trial court abused its discretion in allowing the State to present victim impact testimony in the guilt/innocence phase of the trial over Appellant's objection.

**POINT OF ERROR NO. TEN:** The trial court erred in denying Appellant's motion for a mistrial and allowing a victim's family member to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented.

**POINT OF ERROR NO. ELEVEN:** The trial court erred in denying Appellant's request to remove a family member of the victim from the courtroom, and allowing her to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented.

**POINT OF ERROR NO. TWELVE:** The evidence was insufficient to support an affirmative finding to the special issue in the punishment phase regarding future dangerousness.

**POINT OF ERROR NO. THIRTEEN:** The evidence was insufficient to support the negative answer to the special issue regarding mitigating circumstances to warrant a life sentence rather than death.

**POINT OF ERROR NO. FOURTEEN:** The trial court erred in admitting evidence of extraneous offenses allegedly committed by Appellant as the prejudicial effect of the extraneous acts outweighed any probative value, and the introduction thereof was reversible error.

4

# STATEMENT OF FACTS

Appellant was indicted by a Harris County grand jury for the offense of capital murder. (C.R. I-2). Appellant plead not guilty, and trial was to a jury. (R.R. XXIV-9). The State began by calling Sergio Salinas, a part time police officer with the city of Bellaire. (R.R. XXIV-22). Salinas was on patrol on December 24, 2012, when he heard another officer Corporal Jimmie Norman on his radio indicating that he believed an individual he was attempting to detain was not going to stop. (R.R. XXIV-29). Salinas then began heading to Norman's location. (R.R. XXIV-29). Salinas traveled down several streets, listening to Norman's description of his direction of travel. (R.R. XXIV-32-36). After Norman's last broadcast, Salinas was unable to locate his exact location. (R.R. XXIV-37). Salinas then heard a radio broadcast of an officer down, and preceded to the location. (R.R. XXIV-38-39). He heard further radio traffic that the alleged shooter had taken off running, so Salinas attempted to setup a perimeter in order to catch the suspect. (R.R. XXIV-39-40). After hearing that the suspect was in custody Salinas went to the location of the alleged shooting. (R.R. XXIV-40-41). When he arrived at the location he observed Norman and another person laying on the ground. (R.R. XXIV-41). A detective with the Bellaire Police Department asked Salinas to speak to two Spanish speaking witnesses to ascertain what they had observed. (R.R. XXIV-42). He was able to

5

ascertain that there was only one suspect involved in the shooting. (R.R. XXIV-44). Salinas then placed crime scene tape around the location and began assisting other officers in marking evidence. (R.R. XXIV-48-52). He next served as the sponsor for State's Exhibit No. 6, a copy of the dispatch tape involving the alleged incident. (R.R. XXIV-52-61).

Through an interpreter, Selvin Romero-Amaya next testified for the State. (R.R. XXIV-64). Amaya testified that on December 24, 2012, while driving his vehicle, he was struck from behind by a small car driven by a black man. (R.R.XXIV-65-67). When Amaya looked in his rearview mirror, he saw a patrol car behind them with his emergency lights on. (R.R. XXIV-67). He pulled over but the vehicle that struck him did not stop. (R.R. XXIV-68). While attempting to pass Amaya the car that struck him also struck another vehicle in an attempt to pass him. (R.R. XXIV-68-69). Amaya then began following the car that hit him, with the police car following them both. (R.R. XXIV-69-70). When the vehicle he was chasing finally stopped, Amaya got out of his truck with his insurance card, waiting for the officer who had been following. (R.R. XXIV-71-72). The officer arrived and began attempting to arrest the black man in the small vehicle. (R.R. XXIV-74-75). Amaya was standing between his truck and the suspect's vehicle and observed the suspect moving inside his vehicle. (R.R. XXIV-77). Amaya saw another man come out of

6

the business and approached the vehicle in an effort to assist the police officer. (R.R. XXIV-76). Amaya then saw the suspect pull out a pistol and shoot the officer in the face and saw the officer fall on his back. (R.R. XXIV-77). The other man tried to run away, but the suspect shot him also. (R.R. XXIV-78). Amaya had thrown himself on the ground and was watching to see where the suspect was going. (R.R. XXIV-78). Amaya went to the Houston Police Department to give a statement to other police officers, which ended his involvement. (R.R. XXIV-81-82).

The State next called Stephanie Pacheco. (R.R. XXIV-87). On December 24, 2012, Pacheco was working at CarQuest located next door to Maaco. (R.R. XXIV-88-89). Early that morning she heard a big engine noise outside, and went outside to see what was going on. (R.R. XXIV-90). She saw three vehicles speed into the driveway, a black car ,followed by a white truck, followed by a police vehicle. (R.R. XXIV-91). The small car came to a stop, near a dumpster, with the white truck behind it, and the police car behind the truck. (R.R. XXIV-95). She then saw the officer get out of his vehicle and a gentleman get out of the white truck, but the driver of the small vehicle did not exit his vehicle. (R.R. XXIV-95). The officer walked up to the small car and began struggling with the driver. (R.R. XXIV-95-96). She then saw the driver of the vehicle duck down and when he raised up he began shooting a firearm. (R.R. XXIV-98). She then observed the officer fall onto the ground. (R.R.

7

XXIV-98). The shooter then stood up outside of his vehicle and began firing toward the Maaco store. (R.R. XXIV-99). Pacheco then began running back to CarQuest. (R.R. XXIV-100). As she was running she saw other police vehicles pull into the parking lot, and heard additional gunshots. (R.R. XXIV-101). Pacheco later went to the Houston Police Department and gave her statement. (R.R. XXIV-103).

William Bledsoe, a Bellaire police officer testified next for the State. (R.R. XXV-3). Bledsoe was on duty on December 24, 2012, and had spoken to Corporal Norman regarding their work that day. (R.R. XXV-6-8). Later, while Bledsoe was speaking with other officers at the police department, they heard over the radio that an officer, later identified as Norman, had a suspect fleeing from him. (R.R. XXV-9). Bledsoe and another officer got into Bledsoe's patrol car and went to assist Norman. (R.R. XXV-10-11). While attempting to locate the pursuit, Bledsoe was flagged down by civilians indicating where he should go. (R.R. XXV-17). Bledsoe then heard what he believed to be a gunshot as he was entering the parking lot where he was directed. (R.R. XXV-18). Bledsoe came to a stop next to Norman's police vehicle, and observed Norman to be laying on the ground with a black male standing over him, and another person laying on the ground next to him. (R.R. XXV-23). He observed the black male to be holding a gun in his right hand. (R.R. XXV-23). Bledsoe then ran toward the person, shooting at him. (R.R. XXV-24). After firing

8

two shots at Bledsoe the black male began running. (R.R. XXV-24). Bledsoe then stopped to check on Norman while another officer chased the suspect. (R.R. XXV-25-26). Bledsoe observed a Hispanic male kneeling next to the other person who had been shot. (R.R. XXV-26). After assisting the paramedics with loading Norman into the ambulance, Bledsoe then met with the investigating officers to provide his version of the incident. (R.R. XXV-30-38). After being placed on administrative leave for two weeks, Bledsoe returned to duty. (R.R. XXV-40). Bledsoe then served as the sponsor for several State's Exhibits consisting of photographs and a video. (R.R. XXV-40-48).

The State next called Philip Dickinson, a commander for the Bellaire Fire Department. (R.R. XXV-60). Dickinson was on duty on December 24, 2012, when he heard a large number of sirens from the neighboring police department. (R.R. XXV-63-64). Dickinson went to his command car and turned his radio to the police channel and heard Corporal Norman involved in a chase. (R.R. XXV-65-66). After overhearing on the radio that shots had been fired and that an ambulance was needed, Dickinson left in his command vehicle and responded to the location of the shots fired. (R.R. XXV-67-68). As he neared the scene, he was flagged down by police officers and assumed it was safe for him to enter the scene. (R.R. XXV-69). Dickinson exited his vehicle, retrieved his medical equipment and observed two

victims lying on the ground. (R.R. XXV-70). Dickinson observed the first victim to be deceased, so he went to Corporal Norman in order to assist him. (R.R. XXV-72). He observed Norman to have been shot somewhere near the corner of his jaw, with an exit wound near his temple. (R.R. XXV-73). After other medical personnel arrived, Bledsoe went to check on the other shooting victim and did not find him to have a pulse. (R.R. XXV-75-76). Dickinson eventually went to the hospital where Norman was eventually pronounced dead. (R.R. XXV-78-80). He later returned to duty. (R.R. XXV-85-83).

Next, the State called Richard Knepp, a firefighter, paramedic for the city of Bellaire. (R.R. XXV-85). On December 24, 2012, Knepp was the paramedic in charge when he was dispatched to a location where, upon his arrival, he saw two patients laying on the ground, with police officers and other firefighters at the scene. (R.R. XXV-92). Based upon the observations he made of the two victims, Knepp began treating Corporal Norman. (R.R. XXV-94). Knepp continued his treatment on Norman in the ambulance during the transport to the hospital. (R.R. XXV-96). Upon arrival at the hospital, Knepp transferred care to the trauma doctors. (R.R. XXV-97). Knepp stayed until Norman was pronounced deceased. (R.R. XXV-97).

Another police officer for the city of Bellaire, Douglas Clawson testified that on December 24, 2012, he, along with other officers, attempted to assist Corporal

10

Norman in chasing a suspect. (R.R. XXV-113-116). When he arrived at the scene of where the chase ended, he heard gunshots and observed Corporal Norman laying on the ground with the suspect standing over him holding a black pistol. (R.R. XXV-119). As Clawson got out of his vehicle, he began firing at the suspect. (R.R. XXV-120). When the suspect began running, Clawson chased after him, continuing to shoot. (R.R. XXV-122). Clawson eventually caught the suspect. (R.R. XXV-127-128). He was then separated from other witnesses, and provided his statement to other officers. (R.R. XXV-134-136). He was shown a photo array, and identified someone other than Appellant as being the shooter. (R.R. XXV-136).

Bellaire police detective Gil Macedo testified next. (R.R. XXV-147). On December 24, 2012, Macedo was a patrol officer for the Bellaire Police Department, and was supervised by Corporal Jimmie Norman. (R.R. XXV-149). While working at the police department that morning, he heard over the radio that Norman was attempting to stop a vehicle which would not stop. (R.R. XXV-151). Macedo then entered his patrol unit and attempted to assist Norman as a backup officer. (R.R. XXV-152). After hearing over the radio that shots had been fired, Macedo preceded to the location and attempted to locate the suspect. (R.R. XXV-155). Macedo and another officer eventually located the suspect and took him into custody. (R.R. XXV-159-164). He then called for an ambulance to treat the suspect. (R.R. XXV-167-

11

170).

Marco Zarate, a motorcycle officer for the Bellaire Police Department testified that on December 24, 2012, he was "running a radar" when he heard on his radio that Corporal Norman was pursuing a vehicle which would not stop. (R.R. XXV-178-190). Zarate then headed toward the chase on his motorcycle to assist. (R.R. XXV-181-182). He eventually located two other officer who had taken the suspect into custody. (R.R. XXV-184). He then assisted in taking the suspect into custody. (R.R. XXV-185-189).

The former director of a children's day care center, Stephanie Bilbo testified that on December 24, 2012, she was at work when she saw a black man running toward the day care with a police officer chasing him. (R.R. XXV-192-205).

Houston police officer Tasha LeBlanc, testified that on December 24, 2012, she and another officer were dispatched in reference to an accident where an individual failed to stop and provide his information. (R.R. XXVI-5-8). She located a license plate from the vehicle which allegedly belonged to the suspect's girlfriend. (R.R. XXVI-12). She then went to a hospital to identify a suspect by fingerprint. (R.R. XXVI-13-15). The suspect was identified as Appellant. (R.R. XXVI-15).

Houston police officer James Duerer, a crime scene investigator, testified as to his collection of evidence revolving the shooting of a Bellaire police officer and a

12

citizen on December 24, 2012. (R.R. XXVI-16-36). Houston police officer Christopher Duncan, another crime scene investigator, testified as to his involvement in the collection of evidence. (R.R. XXVI-36-115). Another crime scene investigator, Houston police officer Alton Holmes, also testified as to his involvement in the collection of evidence. (R.R. XXVI-126-168). Adriane King, another Houston Police Department crime scene investigator, testified to the same. (R.R. XXVI-181-207).

Keanna Williams testified that she knew Appellant, and was friends with him in December 2012. (R.R. XXVI-210-211). On December 24, 2012, Appellant drove Williams to work in a black Honda. (R.R. XXVI–217). After Williams arrived at work she observed police cars " zooming down the street." (R.R. XXVI-218-219). While she was in Appellant's vehicle, Williams never saw a weapon not did she observe Appellant to be behaving abnormally. (R.R. XXVI-219).

Houston police sargent Colin Howard testified that on December 24, 2012, he assisted in the investigation surrounding Corporal Norman's death. (R.R. XXVI-21-23). He then testified as to the details on his investigation. (R.R. XXVI-224-248).

Houston police officer Tyson Hufstedler testified that on December 24, 2012, he and Houston police officer Dan Arnold were assigned to perform a follow up investigation regarding the shooting of Corporal Norman and a citizen. (R.R. XXVI-

13

250-252). Hufstedler testified as to the detail of his investigation. (R.R. XXVI-252-258).

Greg Barlett, a Bellaire police officer testified that on December 24, 2012, he was present at the Bellaire Police Department when he overheard radio traffic involving Corporal Norman in a pursuit. (R.R. XXVII-3-8). After the incident, Bartlett was assigned to review all of the videos from that day as well as conduct an administrative review into the actions of officers Bledsoe and Clawson. (R.R. XXVII-11). He then testified as to the details of his review of the video tapes. (R.R. XXVII-12-51).

Michael Condron, II, an assistant medical examiner for the Harris County Medical Examiner's Office testified as to the autopsy performed on Jimmie Norman and Terry Taylor. (R.R. XXVII-67-85).

Clay Davis a forensic DNA analyst with the Houston Forensic Science Center testified as to the testing of DNA evidence obtained during the investigation herein, and the results of his examination therefrom. (R.R. XXVII-88-118). Kimberly Zeller, also employed in the Houston Forensic Science Center testified as to her analysis of the firearms involved. (R.R. XXVII-122-152).

The State next called Jaime Norman, Corporal Norman's brother, to identify a picture of Corporal Norman in life. (R.R. XXVII-157-162). The State also called

14

Courtney Faigle, Terry Taylor's daughter, to identify a picture of Taylor. (R.R. XXVII-163-167). Whereupon the State rested. (R.R. XXVII-167).

Appellant began by testifying in his own behalf. (R.R. XXVIII-3). On December 24, 2012, Appellant was driving his girlfriend, Shamika Hudson's car when he took his friend Keanna Williams to work. (R.R. XXVIII-5-6). After dropping Williams at work, he was then supposed to take Hudson's vehicle to her. (R.R. XXVIII-6). While driving to Hudson's home, he observed a police officer behind him, and was concerned about being stopped and having his car towed as there was a misdemeanor warrant for his arrest. (R.R. XXVIII-7). Appellant admitted that he was at fault for causing the high speed chase. (R.R. XXVIII-10). After Appellant was in the collision with the white truck, he had hit his head on his steering wheel, and the vehicle would not steer nor drive properly. (R.R. XXVIII-10-11). Appellant pulled into Maaco parking lot as he felt he would be safe there. (R.R. XXVIII-11). During his encounter with Norman, Appellant was asking to call his father. (XXVIII-13-14). Appellant did not remember firing at the officer when he came out of his vehicle, but he did remember officers firing at him. (R.R. XXVIII-16). Furthermore, he did not remember running from the scene, but remembered being stomped on. (R.R. XXVIII-17). Whereupon Appellant rested. (R.R. XXVIII-55).

15

Following arguments of counsel and deliberations, the jury found Appellant guilty of capital murder as charged in the indictment. (R.R. XXVIII-85-86). During the punishment phase of the trial additional evidence was presented. (R.R. XXIX-47, et seq). Following further arguments of counsel and deliberations, the jury found the special issues adversely to Appellant, and the trial court sentenced Appellant to death. (R.R. XXXV-6). Appellant timely perfected Notice of Appeal to this Honorable Court complaining of the error as set forth hereinafter. (C.R. VIII-1566).

## SUMMARY OF THE ARGUMENTS

Appellant was indicted for the offense of capital murder, alleging that he intentionally or knowingly caused the death of two individuals in the same criminal transaction. As instructed by the trial court, and in compliance with the law, the jury could only convict Appellant of capital murder if it believed the State proved beyond a reasonable doubt that Appellant caused both deaths with the requisite culpable mental state of "intentionally" or "knowingly". As the State failed to prove the required culpable mental state beyond a reasonable doubt, the evidence was insufficient to sustain the conviction of capital murder. As such, the trial court erred in denying Appellant's motion for an instructed verdict of not guilty.

Appellant objected to the trial court's jury charge as it shifted the burden to Appellant to prove his innocence under the facts herein. He further objected that the trial court refused his requested instruction for the lesser included offense of felony murder. The erroneous jury charge harmed Appellant. As such, the trial court abused its discretion in denying Appellant's requests.

Appellant requested that the trial court limit the number of law enforcement officers that could be present in the courtroom in uniform. Their presence served no purpose other than to inflame the minds of the jury and to suggest an expected result from them. As such, the trial court erred in denying Appellant's request.

17

Additionally, the State was allowed to engage in improper argument before the jury numerous times, over Appellant's objections. The complained of argument did not fall within any area of permissible jury argument. The cumulative effect of the trial court's erroneous rulings constituted fundamental error denying Appellant a fair trial.

The State was also allowed to present victim impact evidence in the guilt/innocence portion of the trial. One of the victims' widows was present in the courtroom, and was understandably weeping during testimony. The State went so far as to point our her presence to the jury through the testimony of a State's witness. Appellant reluctantly asked that either she be removed from the courtroom, or that a mistrial be granted based upon the fact that her and the State's conduct resulted in victim impact evidence being presented to the jury at a time it was completely inadmissible. As such, the trial court erred in denying his requests.

The State failed to adduce evidence beyond a reasonable doubt sufficient to support the negative answer to the special issue regarding mitigation in punishment sufficient for a life sentence instead of death.

Over Appellant's objection, numerous incidents of extraneous offenses and bad acts were introduced into evidence. The result therefrom was for the jury to convict Appellant for being a "bad person". Their probative value was exceedingly

outweighed their prejudicial effect. The trial court, therefore, reversibly erred in allowing their introduction.

## ARGUMENTS AND AUTHORITIES

**POINT OF ERROR NO. ONE**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed intentionally, as required by statute.

**POINT OF ERROR NO. TWO**: The evidence was not legally sufficient to sustain the conviction because the evidence was insufficient to prove that the alleged offense was committed knowingly, as required by statute.

**POINT OF ERROR NO. THREE:** The trial court erred in denying Appellant's motion for instructed verdict of not guilty.

The above points of error are discussed together because they involve similar arguments and authorities.

Appellant was indicted for capital murder, in that he ". . . did then and there unlawfully, during the same criminal transaction, intentionally and knowingly cause the death of Jimmie Norman by shooting the Complainant with a deadly weapon, namely a firearm, and intentionally and knowingly cause the death of Terry Taylor by shooting the Complainant with a deadly weapon, namely a firearm." (C.R. 2). The court charged the jury that if they believed Appellant intentionally or knowingly caused the deaths of both complainants during the same criminal transaction by shooting each of them with a deadly weapon, a firearm, they must find Appellant guilty of capital murder as alleged in the indictment. (C.R. 1501-1502). The court

20

also charged the jury on the lesser included offense of murder, stating that if they believed beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of complainant Taylor by shooting him with a firearm, or intentionally or knowingly committed an act clearly dangerous to human life by shooting him with a firearm, the must find Appellant guilty of the lesser offense of murder. (C.R. 1502). The jury found Appellant guilty of intentionally and knowingly causing the deaths of both complainants in the same criminal transaction by shooting each complainant with a firearm. (C.R. 1508; R.R. XXVIII-85-86).

The aggravating factor raising the offense herein from murder to capital murder is the deaths of two people in the same criminal transaction. As the jury was charged, and as the jury found, both deaths had to be accomplished by Appellant intentionally or knowingly as those terms were defined for the jury. (C.R. 1501-1502). A culpable mental state of intentionally or knowingly has long been held to be an essential element of murder. *Fitch v. State*, 37 Tex. Crim. 500, 36 S.W. 584 (Tex. Crim. App. 1896); *Domanski v. State*, 665 S.W.2d 793 (Tex. App.-Corpus Christi 1983). Therefore, it was incumbent upon the State to prove beyond a reasonable doubt that not only did Appellant cause the death of both of the complainants, but that he did so intentionally and knowingly. Failure to do so will render the evidence insufficient to sustain the verdict. *Williams v. State*, 537 S.W.2d 936 (Tex. Crim. App. 1976);

21

*Domanski, supra*. It is not enough to prove that Appellant simply caused the death of both complainants by shooting each of them. This, however, is all the State could marshal herein.

In reviewing a challenge to the legal sufficiency of the evidence, the appellate court views all of the evidence in the light most favorable to guilt, and determines whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d.456 (1979); *Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000). Each fact does not have to independently point to the guilt of the accused if the cumulative effect all the evidence is sufficient to sustain the conviction. *Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007). While circumstantial evidence could be sufficient to sustain a conviction for murder, the circumstantial evidence must first exist, and secondly be proven by the State beyond a reasonable doubt. *Hooper, supra*. While appellate courts do not re-evaluate the evidence, nor substitute the court's judgment for that of the fact finder, appellate court do overturn the verdict when it is irrational or unsupported by more than a mere modicum of the evidence. *Dewberry v. State*, 4 S.W.3d 735 (Tex. Crim. App. 1999); *Moreno v. State*, 755 S.W.2d 866 (Tex. Crim. App. 1988). If, a rational jury would necessarily entertain a reasonable doubt as to the defendant's guilt, the due process guarantee requires that this Honorable Court

22

reverse the conviction and acquit Appellant. *Narvaiz v. State*, 840 S.W.2d 415 (Tex. Crim. App. 1992). Lastly, the legal sufficiency of the evidence is measured by the elements as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997). In the case *sub judice*, no fact, circumstantial or otherwise, pointed to the guilt of Appellant causing both deaths intentionally nor knowingly; therefore, the cumulative effect is that the State did not prove each and every essential element beyond a reasonable doubt.

The jury charge in the cause *sub judice* charged as follows:

"Now, if you find from the evidence beyond a reasonable doubt that on or about the 24th day of December, 2012, in Harris County, Texas, the defendant, Harlem Harold Lewis, III, did then and there unlawfully, during the same criminal transaction, *intentionally or knowingly* cause the death of Jimmie Norman by shooting Jimmie Norman with a deadly weapon, namely a firearm, and *intentionally or knowingly* cause the death of Terry Taylor by shooting Terry Taylor with a deadly weapon, namely a firearm, then you will find the defendant guilty of capital murder, as charged in the indictment.

23

"Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, of if you are unable to agree, you will next consider whether the defendant is guilty of the lesser offense of murder." (C.R. 1501-1502).

Therefore, pursuant to the court's charge, the only manner in which the jury could find Appellant guilty of the offense of capital murder, was to find, *inter alia*, that he shot both complainant Norman and complainant Taylor, the *actus reus,* and did so intentionally or knowingly as to both complainants, the *mens rea*. Fatal to the verdict, however, is the absence of any evidence proving beyond a reasonable doubt both the *mens rea* of Appellant and the *actus reus* of Appellant's actions. While it is clear that the State proved the *actus reus* as it relates to the death of complainant Taylor, it is equally clear the State did not prove the *mens rea* as to either death. Obviously both complainants were shot with a firearm other than his own. However, that is insufficient to sustain the conviction herein for capital murder. The State must still prove that Appellant shot both of them with the requisite culpable mental state of intentionally or knowingly. The State did not prove this beyond a reasonable doubt. Even if the jury were correct to find that Appellant caused the deaths of Norman and Taylor in the same criminal transaction, that is only half of the offense.

24

It is clear from the record that a struggle ensued between Norman and Appellant inside Appellant's vehicle. What is not clear is whether the shooting of Norman was caused during the struggle with the firearm. That clearly would militate against the verdict as the required mental state would not be present. Nothing the State adduced at trial proved beyond a reasonable doubt that Appellant intentionally or knowingly caused Norman's death as required. Assuming, *arguendo*, the jury could believe Appellant intentionally or knowingly caused the death of Taylor, that alone does not suffice to proved beyond a reasonable doubt that Norman's death was also caused intentionally or knowingly. Appellant reminds this Honorable Court that to sustain the conviction herein, *both* deaths must have been caused intentionally or knowingly. Applying the aforementioned *Jackson* standard, the evidence conceivably established the death of the complainants by Appellant. However, this is not enough to sustain the conviction. This merely proves, if believed, the *actus reus* of the offense. Proving one death was so caused does not prove the other death was also so caused. Additionally, proving simply that Appellant caused Norman's death is not tantamount to proving it was caused with the requisite intent. To hold otherwise it to hold that the *actus reus ipso facto* proves the required *mens rea* of the offense. This is clearly untenable.

Arguably, the evidence potentially could support a conviction for causing the

25

complainants deaths recklessly or by criminal negligence.[1]  However, this is not the offense for which he was indicted.  (C.R. 2).  The jury was not charged to find Appellant guilty if they believed beyond a reasonable doubt that Appellant recklessly or with criminal negligence caused the complainants' deaths. (C.R. 1501-1502). The State was required to prove beyond a reasonable doubt that he did so intentionally or knowingly as to both complainants, and the jury could only convict Appellant if they so believed beyond a reasonable doubt. *Williams, supra; Fitch, supra*.  Therefore, no rational trier of fact could have found all the essential elements beyond a reasonable doubt.

At the close of the State's case in chief, Appellant moved for an instructed verdict of not guilty.  (R.R. XXVII-168).  The trial court summarily denied Appellant's motion.  (R.R. XXVII-168).  An appeal of the denial of a motion for an instructed verdict is a challenge to the legal sufficiency of the evidence.  *Canales v. State*, 98 S.W.3d 690 (Tex. Crim. App. 2003).  Because the  State failed to prove beyond a reasonable doubt Appellant caused the death of each the complainants, and caused the deaths intentionally or knowingly as alleged, and because the jury was charged to find Appellant guilty only if they found beyond a reasonable doubt that

---

[1]Appellant does not concede that the evidence does in fact support such a conviction, but merely presents this by way of argument.

26

both homicides were intentionally or knowingly, the evidence is legally insufficient to sustain the verdict. As such, the trial court erred in denying Appellant's motion for an instructed verdict. The evidence is therefore insufficient to support the conviction of capital murder as alleged, warranting an acquittal. *Burks v. United States,* 437 U.S. 1, 98 S. Ct 2141, 57 L. Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S. Ct. 2151, 57 L. Ed.2d 15 (1978). For these reasons, Appellant urges that this Honorable Court sustain these points of error, reverse the judgment and sentence herein, and that a judgment of acquittal as to capital murder be entered. *Tibbs v. Florida*, 457 U.S. 31, 102 S. Ct. 221, 72 L. Ed. 2d 652 (1982); *Narvaiz v. State*, 840 S.W. 2d 415 (Tex. Crim. App. 1992); *Collier v. State*, 999 S.W. 2d 779 (Tex. Crim. App. 1999).

**POINT OF ERROR NO. FOUR:** The trial court abused its discretion by overruling Appellant's objection to the trial court's jury charge which shifted the burden of proof to Appellant.

**POINT OF ERROR NO. FIVE:** The trial court abused its discretion by denying Appellant's request for a jury instruction for the lesser included offense of felony murder.

The above points of error are discussed together as they involve similar arguments and authorities.

Appellant lodged two objections to the trial court's jury charge in the guilt/innocence portion of the trial. First, Appellant objected that the jury charge had the effect of shifting the burden to Appellant to prove his innocence. Specifically, he objected to the section of the charge which stated that the jury's "sole duty at this time is to determine the guilt or innocence of the defendant under the indictment in this cause and restrict your deliberations solely to the issue of guilt or innocence of the defendant." (C.R. VIII-1506-1507; R.R. XXVIII-63). Appellant specifically requested that the following be substituted for the complained of erroneous portion: "Your sole duty at this time is to determine whether the State of Texas has met its burden to prove guilt beyond a reasonable doubt in this cause." (R.R. XXVIII-63). Appellant also requested that the trial court charge the jury as to the lesser included offense of felony murder. (R.R. XXVIII-63). The trial court perfunctorily overruled

28

Appellant's objections and denied his requests. (R.R. XXVIII-63).

In reviewing a claim of jury charge error, an appellate court must determine first, whether error actually occurred, and, second, whether the resulting harm requires reversal. *Middleton v. State*, 125 S.W.3d 450 (Tex. Crim. App. 2003). If jury charge error does exist, the appellate court must then determine whether the resultant harm was of sufficient magnitude to require reversal. *Ovalle v. State*, 13 S.W.3d 774 (Tex. Crim. App. 2000). If the error in the charge was the subject of an objection, reversal is required if the record shows no more than "some harm" to the defendant. *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984). It is clear that the trial court's charge relieved the State from its burden of proving each and every element beyond a reasonable doubt, shifting the burden to Appellant to prove his innocence.

The burden of proof in a criminal prosecution is always placed on the State of Texas. An attempt to shift the burden of proof violates due process guarantees under both the U. S. and Texas Constitutions. *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Brown v. State*, 122 S.W.3d 794 (Tex. Crim. App. 2003). Both *Brown* and *Franklin* make clear that any attempt to shift the burden of proof to a defendant on a critical element or fact of the offense is improper.

Due process guarantees an accused be protected "against conviction except

upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Further, it has long been axiomatic that the presumption of innocence "lies at the foundation of the administration of our criminal law." *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005)*; Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895). This "bedrock, 'axiomatic and elementary' [constitutional] principle," prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Sandstrom* v. *Montana* 442 U.S. 510, 99 S. Ct. 2450, 61 L.Ed.2d 39 (1979); *Winship, supra*.

The jury charge herein subverted this fundamental concept and should not have been allowed. The jury charge told the jury that its *sole* duty was to determine the guilt *or innocence* of Appellant. That is not, however, the jury's sole duty. Its sole duty is to determine whether the State has proven each of the elements of capital murder as alleged in the indictment beyond a reasonable doubt. Appellant recognizes that the jury charge informs the jury that the burden rests upon the State and never shifts to the defendant. (C.R. VIII-1505). It further charges the jury that Appellant is not *required* to prove his innocence or produce any evidence at all. (C.R. VIII-

30

1505).  However, Appellant did produce evidence.  He testified in his own defense. (R.R. XXVIII-3, *et. seq.*).  The jury is now left with evidence presented by the State and evidence presented by Appellant.  The charge is silent as to the fact that Appellant's presentation of evidence has no effect on the State's burden.  The charge instructs them that their *sole* duty is to determine guilt *or innocence*.  Therefore, the charge in effect requires the jury to weigh the evidence presented by the State against the evidence produced by Appellant instead of against the State's constitutional burden.  As Appellant did produce evidence, by erroneously instructing the jury their sole duty included determining innocence as well as guilt, the trial court shifted the burden to Appellant, thereby relieving the State of their constitutional obligation.

Furthermore, the trial court abused its discretion in denying Appellant's request for a lesser included instruction of felony murder.  A defendant is entitled to a lesser included offense instruction if proof of the charged offense includes the proof required to establish the lesser included offense, and there is *some* evidence in the record that would permit a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser included offense.  *Ex parte Watson*, 306 S.W.3d 259 (Tex. Crim. App. 2009); *Hall v. State*, 225 S.W.3d 524 (Tex. Crim. App. 2007);  *Hayward v. State*, 158 S.W.3d 476, 478 (Tex. Crim. App.2005); *Campbell v. State,* 149 S.W.3d 149, 153 (Tex. Crim. App.2004);  *Ferrel v. State*, 55 S.W.3d 586 (Tex. Crim. App.

2001)(Emphasis added).  The law in Texas provides for consolidating greater and lesser included offenses by including both in the charge to the jury on the trial of the greater offense.  *Stephens v. State*, 806 S.W.2d 812 (Tex. Crim. App. 1990); Art. 37.08, Tex. Code Crim Proc.  Therefore, once it is established that the offense is a lesser included offense, the evidence must not absolutely show Appellant to be guilty *only* of the lesser included offense.  It need only *support* a finding by the jury that he is guilty of only the lesser included offense.  A lesser included offense is defined in Art. 37.09, Tex. Code Crim. Proc. as follows:

"An offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense

charged or an otherwise included offense."

Therefore, " . . .the elements of the offense claimed to be a lesser included offense must be examined to see if the elements are functionally the same or less than those required to prove the charged offense." *Jacob v. State*, 892 S.W.2d 905 (Tex. Crim. App. 1995). If the evidence raises an issue of a lesser included offense, a jury charge on that offense is mandatory, regardless of whether the evidence is from the State or the defendant, or whether it is strong, weak, unimpeached, or contradicted, or consistent with other evidence. *Hall v. State*, 158 S.W.3d 470 (Tex. Crim. App. 2005); *Bell v. State*, 693 S.W.2d 434 (Tex. Crim. App. 1985). A jury may selectively believe some of the proffered and introduced evidence and reject other such evidence and thus conclude that an accused is guilty of a lesser included offense, which would require the submission of the lesser charge. *Evans v. State,* 781 S.W.2d 376 (Tex. App. - Houston [14th Dist.] 1989). The appellate court must consider all evidence presented at the trial in deciding whether the evidence raises the issue of the lesser included offense. *Lugo v. State*, 667 S.W.2d 144 (Tex. Crim. App. 1984). Furthermore, the appellate court must examine the pleading and determine the whether the Appellant could factually be guilty of the lesser offense, as stated in *Hall, supra,* at page 535:

33

"We now hold that the pleadings approach is the sole test for determining in the first step whether a party may be entitled to a lesser-included-offense instruction. The availability of a lesser-included instruction in a given case still would depend on the second step, whether there is some evidence adduced at trial to support such an instruction.

The first step in the lesser-included-offense analysis, determining whether an offense is a lesser-included offense of the alleged offense, is a question of law. It does not depend on the evidence to be produced at the trial. It may be, and to provide notice to the defendant must be, capable of being performed before trial by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense.

The evidence adduced at trial should remain an important part of the court's decision whether to charge the jury on lesser-included offenses. The second step in the

34

analysis should ask whether there is evidence that supports giving the instruction to the jury. 'A defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary to establish the lesser-included offense and there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense.' In this step of the analysis, anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. In other words, the evidence must establish the lesser-included offense as 'a valid, rational alternative to the charged offense.'"

It is beyond dispute that felony murder is a lesser included offense of capital murder. *Threadgill v. State*, 146 S.W.3d 654 (Tex. Crim. App. 2004). The distinguishing element between the two offenses is the intent to kill. *Fuentes v. State*, 991 S.W.2d 267 (Tex. Crim. App. 1999). In order to convict Appellant of capital murder, the State had to prove that he intentionally or knowingly killed two persons, Norman and Taylor, in the same criminal episode as alleged in the indictment. (C.R.

2). However, a subset of elements as to a lesser included offense of felony murder would be that Appellant intentionally or knowingly killed Officer Norman, but did not intentionally or knowingly kill Taylor, or vice versa. Appellant could have caused one victim's death recklessly, or with criminal negligence. Therefore, there would have been no *intent* to kill two people in the same criminal episode. *Fuentes, supra*. As such, Appellant could have been convicted of the lesser included offense of felony murder. Therefore, there was evidence before the jury that raised the issue of a lesser included offense. Its submission to the jury, therefore, was mandatory. *Hall, supra; Bell, supra*. The trial court, therefore, erred in denying Appellant's requested lesser included offense charge.

As the record reveals constitutional errors, this Honorable Court must reverse the judgment of conviction, unless the Court determines beyond a reasonable doubt, that the errors did not contribute to the conviction. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In making a harmless error determination, the appellate court does not focus on the weight of other evidence of guilt. *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989) (en banc). Further, the Court calculates, as much as possible, the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000).

The Court asks if a reasonable probability exists that the errors, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt. *Wesbrook, supra.* If so, the errors are harmful. *Wesbrook*, supra.

To shift the burden to Appellant through its erroneous charge under the facts of the cause *sub judice* relieved the State of the inconvenience is meeting its burden. Clearly, this error affected the jury's decision making process and it cannot be concluded beyond a reasonable doubt that this error did not contribute to the conviction. Having shown error to exist in the jury charge, Appellant next submits it is blindingly obvious that he has suffered at a very minimum "some harm" due to the erroneous charge, and has therefore met his burden. *Almanza, supra.* He was sentenced to death. There can be no greater harm suffered than to be killed at the hands of the State of Texas. Had the trial court's charge not shifted the burden to Appellant, and had Appellant's request been granted and the lesser included instruction on felony murder been provided as it should have, there was ample evidence from which a jury could rationally acquit the defendant of the greater offense of capital murder as it did, and convict him of the lesser included offense of felony murder. Because the charge shifted the burden from the State to Appellant, and because the jury was prohibited from finding Appellant guilty of felony murder by the irreconcilable, erroneous charge, Appellant suffered the requisite harm. For

these reasons, Appellant urges this Honorable Court to sustain these issues.

**POINT OF ERROR NO. SIX:** The trial court erred in allowing an unreasonable amount of peace officers in uniform to appear in the audience denying Appellant due process of law and a fair trial.

Appellant requested that the trial court limit the number of uniformed police officers attending the proceedings in the presence of the jury, since Appellant was on trial for alleged capital murder, which included the death of a police officer. (R.R. XXIII-9). Appellant correctly noted that a large contingent of uniformed officers "crosses the line into either intimidation or an expectation of a certain outcome from the jury." (R.R. XXIII-10). The motion was summarily denied. (R.R. XXIII-10). Interestingly, in ruling on Appellant's motion, the trial court stated it would allow as many uniformed members of law enforcement to be present in the courtroom as desired, but required that any officer present not be on duty, as reflected beginning at R.R. XXIII-10, to-wit:

"THE COURT: The motion will be denied. I do have one requirement for any officer that comes in, and that is that they're not on duty. So, I don't want anybody working in this room. If they're off duty, then can come in. If they're on duty, they need to be on duty. So, obviously, the officers who testify in the case, but . . . .

39

. . . .

Anybody who's in the audience simply for the purpose of being in the audience, needs to be off duty. That's my requirement, so . . . .

. . . .

I personally object to officers who are actually on duty being paid just sitting in the audience. They need to be out there doing their job. So, if they're off duty, not getting paid, then they can sit. And I don't care - - I mean, it's an open courtroom. *They can wear their uniform if the want to nor not*. It doesn't matter to me in that regard, but . . . ."(Emphasis added).

Clearly, the trial court was more concerned with the payroll of a city department over which it has no authority than the ultimately unjust impact the sea of law enforcement officers in the courtroom would have on Appellant. In denying Appellant's motion, the trial court specifically did not limit the number of officers that could be in the courtroom in uniform, specifically stating that it did not matter to the court. (R.R. XXIII-12). It defies logic to find a nexus between the presence of uniformed officers, and whether those officers were being paid while sitting in the

courtroom as being on duty. While it was obvious to any juror that someone in a police officer's uniform was a police officer, it was not obvious, nor did it matter, to any juror whether that officer was on duty, or whether they were being paid. It was the presence of the great number of uniformed officers which was designed to influence the jury, not whether they were "on the clock."

Appellant points out that he was on trial for the offense of capital murder involving a peace officer, who was a uniformed officer on duty at the time of the incident in question. The presence of uniformed officers who were not called as witnesses served to deny Appellant a fair trial and due process of law. The presence of the uniformed police officers constituted non-testimonial evidence and were in essence "witnesses" observed by the jury, who were not called and sworn in the trial of the case. Appellant was entitled to be tried on the evidence presented before the jury, without undue influence by other police officers or members of the audience attempting to exert pressure upon the jury. Fundamental to the right to a fair trial as guaranteed by the Sixth and Fourteenth amendments to the United States Constitution is the concept that an accused has the constitutional right to be tried by impartial jurors whose verdict is based on the evidence adduced at trial, and not by external factors. *Taylor v. Kentucky*, 436 U.S. 478, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978); *Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1996). Certain practices pose

41

such a threat to the fairness of the fact-finding process that they must be subjected to close judicial scrutiny. *Estelle v. Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). Any procedure employed by the State which involves such a probability that prejudice will result is deemed inherently lacking in due process. *Estes v. Texas*, 381 U.S. 532, 85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965).

In order to prevail on a claim of reversible error resulting from external juror influence, an appellant may show either actual or inherent harm. *Howard, supra*. In order to show actual influence, an appellant must show whether jurors actually articulated being aware of a prejudicial effect. *Howard, supra*. However, in order to show inherent harm, an appellant need only show a reasonable probability that the influence interfered with the jury's verdict. *Howard, supra*. The appellate court looks to whether an unacceptable risk is presented of impermissible factors coming into play. *Estelle, supra*. That is exactly what happened in the case at bar.

Appellant was on trial for capital murder involving a police officer. He had filed a written motion asking that the number of uniformed officers attending the trial be limited, which was perfunctorily denied. There was absolutely no reason for these officers to be present, other than to pressure and influence the jury without the presentation of evidence. Again, this resulted in influencing the jury through non-testimonial evidence. There can be absolutely no other reason for numerous police

42

officers to appear in the courtroom in uniform during a criminal trial involving the death of a police officer. If the presence of the officers was not for the jury to see, who else in the courtroom were they for? This was nothing more than an impermissible tactic by the State to prejudice the jury. Such an action is clearly inherently lacking in due process, and served to deny Appellant his due process rights to a fair trial. For these reasons, Appellant urges this Court to sustain this point of error.

**POINT OF ERROR NO. SEVEN:** Reversible error occurred when the State was allowed to engage in prejudicial jury arguments which denied Appellant a fair trial.

**POINT OF ERROR NO. EIGHT:** The cumulative effect of the improper arguments of the prosecutor constituted fundamental error requiring a reversal of this cause.

The above errors are discussed together as they involve similar arguments and authorities.

During jury argument in the guilt portion of the trial, Appellant objected numerous times to the State's improper jury argument in the following instances as reflected beginning at R.R. XXVIII-67, to-wit:

"THE STATE: The third page (of the jury charge). It talks about a lesser-included offense. This is something we haven't talked about. But all it is, is if there is any evidence, whether it is big or small, believable or not, the Judge is required to tell you that there might be something you should consider with a lesser. In no way is the Judge trying to say: Hey, the 12 of you-all, this is really - -

MR. McCANN: Objection to a comment on the law, not a comment on the charge. That's improper.

44

THE COURT: Overruled.

. . . .

THE STATE: What kind of man puts a gun to the head of a uniformed police officer and pulls the trigger? What kind of man shoots a 66-year-old white-haired man?

MR. McCANN: Objection. Outside bounds of proper argument.

THE COURT: Overruled.

. . . .

THE STATE: It's like something out of TV that you've seen time and time again in an action movie where the person who is being pursued takes and turn and then takes a turn, trying - -

MR. McCANN: Objection. Matter outside of evidence.

THE COURT: Overruled.

THE STATE: And then to continue with this I'm not going to jail, everyone is going to die before I go to jail, is this photograph showing him pointing at Clawson and

45

Bledsoe as they arrive in the parking lot (indicating).

Is there anything difficult about this concept? Again, you may not want to believe that people like this are - -

MR. McCANN: Objection. Outside proper argument.

THE COURT: Overruled.

THE STATE: - - living in our midst, but they are.

. . . .

What kind of a man kills a police officer in full uniform? You now know what we know as prosecutors. Every traffic stop for an officer - -

MR. McCANN: Objection. Matters outside the record and far beyond the scope of proper argument.

THE COURT: Overruled.

THE STATE: - - is a potential capital murder. They get up and they go to work and they put on their uniform for us, to make our community safe. And every time they pull a car over - -

MR. McCANN: Objection. Beyond the scope of

proper argument, Your Honor.

THE COURT: Overruled.

THE STATE: Every time they pull a car over for speeding, for failure to signal, whatever it is, they know they could die. And they take that on.

MR. McCANN: Objection, Your Honor. This is extremely far beyond the scope of proper plea for law enforcement.

THE COURT: Overruled."

Proper jury argument must fall within one of four general areas: summation of the evidence, reasonable deduction from the evidence, answer to argument of opposing counsel, and pleas for law enforcement. *Guidry v. State*, 9 S. W. 3d 133 (Tex. Crim. App. 1999). "It is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper." *Alejandro v. State*, 493 S. W. 2d 230 (Tex. Crim. App. 1973). Arguments which do not fall within the above parameters and are outside the record have long since been considered error. *Irving v. State*, 573 S.W.2d 5 (Tex. Crim. App. 1978); *Jackson v. State*, 506 S.W.2d 620 (Tex. Crim. App. 1974). This argument is reversible if it is extreme or manifestly improper, is violative of a

47

mandatory statute, or injects new facts harmful to the accused into the trial proceedings. *Bell v. State*, 724 S. W. 2d 780 (Tex. Crim. App.1986). It is furthermore the law that the prosecutor "cannot use closing argument to get evidence before the jury which is outside the record and prejudicial to the accused." *Jackson v. State*, 529 S.W.2d 544 (Tex. Crim. App. 1975). In reversing *Jordan v. State*, 646 S.W.2d 976 (Tex. Crim. App. 1983), because of a prosecutor's reference to evidence outside the record, the court stated at page 948:

> "A prosecuting attorney is permitted in his argument to draw from the facts and evidence all inferences which are reasonable, fair, and legitimate, but he may not use jury argument to get before the jury, either directly or indirectly, evidence which is outside the record. A prosecuting attorney, though free to strike hard blows, is not at liberty to strike foul ones, either directly or indirectly."

The test for determining whether the improper argument is harmful is whether there is a reasonable possibility that the argument might have contributed to either the conviction or the punishment assessed. *Clarke v. State*, 785 S. W. 2d 860 (Tex. App.-Fort Worth 1990). Courts use the following three factors in analyzing the harm associated with improper jury argument: (1) severity of the misconduct (the

48

magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Martinez v. State*, 17 S.W.3d 677, 692 (Tex. Crim. App.2000); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App.1998); *Peak v. State*, 57 S.W.3d 14 (Tex. App.-Houston [14th Dist.] 2001). Applying this to the case at bar, it is clear from the record the State's impermissible argument contributed to Appellant's conviction and sentence. The jury rejected the one lesser included offense available to them, and ultimately sentenced Appellant to death.

In order to preserve error in prosecutorial argument, a defendant must pursue his objection to an adverse ruling by objecting, and, if the objection is sustained, asking for an instruction for the jury to disregard the erroneous argument, and, if granted, moving for a mistrial. *Young v. State*, 137 S.W.3d 65 (Tex. Crim. App. 2004). Appellant pursued his objections to each instance of the State's improper arguments to an adverse ruling, having his objection overruled by the trial court, and has therefore preserved this error for review. As such, this Honorable Court reviews the trial court's denial of a mistrial for an abuse of discretion. *Hawkins v. State*, 135 S. W. 3d 72 (Tex. Crim. App. 2004); *Simpson v. State*, 119 S. W. 3d 262 (Tex. Crim. App. 2003).

This Honorable Court must examine the entire proceeding to determine whether the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S. W. 2d 266 (Tex. Crim. App. 1997). If the error influenced the jury, or had more than a slight effect, this Honorable Court is duty bound to overturn the conviction. *Johnson v. State*, 967 S. W. 2d 410 (Tex. Crim. App. 1998). Under the facts of the case at bar, it is clear that the arguments fell outside the are of permissible jury argument, and therefore had a "substantial and injurious effect or influence in determining the jury's verdict," as the jury rejected a lesser included offense and thereafter sentenced Appellant to die. *King, supra*.

Furthermore, error in a criminal trial does not always exist in isolation, it can have a "synergistic effect" on the jury that hears the case, be found harmful in its cumulative effect, and thereby taint the outcome. *Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999)*; Stahl v. State*, 749 S.W.2d 826, 831 (Tex. Crim. App. 1988). While each of these complained of arguments herein were improper individually, the cumulative effect of this repeated disregard of the common boundaries of proper argument was to deny Appellant a fair trial.

It has long been held, and is a basic foundation, that the law provides for and presumes a fair trial free from improper argument by the prosecuting attorney. *Borjan v. State*, 787 S. W. 2d 53 (Tex. Crim. App. 1990); *Richardson v. State*, 257

50

S. W. 2d 308 (Tex. Crim. App. 1953). The principal purpose of argument to the jury is to aid and assist the jury in properly analyzing the admitted evidence so that it can arrive at a just and reasonable conclusion based on the evidence alone. *Dickinson v. State*, 685 S. W. 2d 320 (Tex. Crim. App. 1984) There is more than a reasonable probability that the improper argument by the prosecutor herein might have contributed to Appellant's conviction. Clearly, therefore, the trial court herein abused its discretion and erred when it overruled Appellant's objections to the State's manifestly improper arguments. For these reasons, Appellant urges this Honorable Court to sustain this error.

**POINT OF ERROR NO. NINE:** The trial court abused its discretion in allowing the State to present victim impact testimony in the guilt/innocence phase of the trial over Appellant's objection.

**POINT OF ERROR NO. TEN:** The trial court erred in denying Appellant's motion for a mistrial and allowing a victim's family member to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented.

**POINT OF ERROR NO. ELEVEN:** The trial court erred in denying Appellant's request to remove a family member of the victim from the courtroom, and allowing her to present victim impact evidence during the guilt/innocence phase of the trial by remaining in the courtroom while openly responding to the testimony being presented.

The above points of error are discussed together in that they involve similar arguments and authorities.

During the State's case in chief in the guilt/innocence portion of the trial, the State elicited victim impact testimony through a law enforcement witness during the State's direct examination of him. The erroneously admitted testimony was offered by the State during the direct examination of William Bledsoe, a Bellaire police officer and co-worker of the victim. Bledsoe testified that he had known the victim for many years and considered him a very good friend. (R.R. XXV-7). While this testimony was not objected to, it served as the genesis of the victim impact evidence

52

to follow.  Over Appellant's objection, the victim impact evidence was admitted beginning at R.R. XXV-36, to-wit:

"Q. (The State): How long did you stay at the Bellaire Police Station?

A. (Bledsoe)  The first time once we left Maaco or when we came back from Houston?

Q.  When you came back from HPD.

A.  Maybe five or ten minutes.

Q.  And then where did you go?

A.  To Misty's or Mrs. - - Jimmie's wife, Corporal Norman's wife's house.

Q.  And is Ms. Norman in the courtroom today?

MR. MONCRIFFE: I'm going to object, once again, to the relevance of that line of questioning, Your Honor.

THE COURT: Overruled.  You can answer that question.

A.  Yes, ma'am, she is.

Q.  Can you point her out and describe what she's wearing?

A. She is the lovely lady in the gray blouse right there (indicating).

MR. MONCRIFFE: Your Honor, once again, we would object to the relevance.

THE COURT: Overruled.

Q. Why did you go to her house?

A. To check on her.

Q. And was she there when you arrived?

A. She was.

Q. Was she alone or were other people with her?

A. There was other people. Her whole family.

Q. And how were they doing?

MR. MONCRIFFE: Once again, we renew our objection to the relevance - -

THE COURT: Sustained.

MR. MONCRIFFE: - - to this line of questioning.

Q. What did you do while you were there?

A. Hugged everybody - -

MR. MONCRIFFE: Once again, Judge, I would

54

object to this line of questioning.

THE COURT: Sustained."

After completing both direct and cross examination of Bledsoe, and outside the presence of the jury, Appellant requested that the victim's widow be removed from the courtroom or that a mistrial be granted due to the presentation of victim impact evidence. (R.R. XXV-55, 56). Although reluctant to ask for her exclusion or for the mistrial the State's conduct caused, Appellant directed the trial court to the testimony of the State's witness wherein the witness specifically pointed her out to the jury and the jury observed her demeanor. Appellant pointed out that she was openly weeping during the "very emotional testimony of her friend, the officer." (R.R. XXV-55). Appellant complained that she had been specifically pointed out to the jury by the State's questioning, sitting on the front row of the audience. (R.R. XXV-55). As Appellant correctly noted, a limiting instruction would not suffice as it would draw attention to the person as opposed to minimizing the error. (R.R. XXV-55). Although the trial court summarily denied Appellant's request, it expressed its concern for displays of emotion during testimony, as reflected at R.R. XXV-58, to-wit:

"THE COURT: But - - I mean, I've denied the request, *but I can't have people openly weeping during the*

55

*testimony*.

MR. GOODHART (The State): Judge, we understand that, but I think everybody in their right mind understands that occasionally the widow is going to weep. She was not sobbing. She was not wailing - -

THE COURT: This is not a debate, Mr. Goodhart. *I'm not going to have anybody openly weeping in the courtroom.* If they cannot handle the testimony, then the need to step out. And especially when we do the videotape of the actual offense, I don't think any - - I mean, *we cannot have reactions in front of the jury, just can't*. They have to be able to be independent and render a verdict according to the law and the evidence.

So, I mean, I've done it before and I'll do it now. If anybody in the courtroom cannot handle the testimony, then they need to step out. So, that's that.

. . . .

Now, this is a difficult case for everyone involved in this case, but *the jury has to be able to render their verdict*

56

*without any outside influence and that includes people in the audience.*

. . . .

And so, I'm telling everyone in this room if you feel that you cannot emotionally handle the testimony that's being presented, you need to leave the room.  Now, that is a reality.  *The jury has to render a verdict according to the law and the evidence and they cannot have anyone outside of - - in this courtroom influence their decision.*  So, I know this is emotional.  I'm not saying it's anything else, *but you cannot express emotion.*  You cannot say anything in front of the jury.

So, does everyone understand that?

AUDIENCE: Yes (in unison).

THE COURT: This is not optional.  Okay?

. . . .

Now, I'm not in the habit of kicking people out of the courtroom, but I cannot allow that to happen.  So, you need to make decisions according to that and not react in

57

front of the jury." (Emphasis added).

The trial court, in its comments, obviously recognized the complained of evidence was victim impact evidence.

Questions of admissibility of evidence in general are subject to an abuse of discretion standard on direct appeal. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007) The trial court abuses its discretion when its decision to admit evidence lies "outside the zone of reasonable disagreement." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Rule 403, Tex. R. Evid., mandates the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. *Davis, supra*. Unfair prejudice refers to an undue tendency to suggest decision on an improper basis, commonly an emotional one. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990).

In *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), the United States Supreme Court addressed the scope and relevance of victim impact evidence. The Court noted that it was "now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the *sentencing phase* evidence of the specific harm caused by the defendant." *Payne, supra*. (Emphasis added). Even though the United States Supreme Court has recognized the use of

victim impact evidence, its use is not accepted in every state.  Some states do allow

victim impact evidence at punishment.  *See State v. Gentry*, 888 P.2d 1105 (Wash.

1995); *Freeman v. State*, 876 P.2d 283 (Okl. Cr. 1994); *Weeks v. Commonwealth*, 450

S.E.2d 379 (Va. 1994).  Others, however, do not.  *See State v. Metz*, 887 P.2d 795

(Or. App. 1994); *Sermons v. State*, 417 S.E.2d 144 (Ga. 1992);  *State v. Atwood*, 832

P.2d 593 (Az. 1992).  Those states that do allow it do so only in punishment.

Therefore, an appellant's moral blameworthiness and culpability is definitely an issue

only *at punishment*.  *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d

256 (1989)*; Stavinoha v. State*, 808 S.W.2d 76 (Tex. Crim. App. 1991).

Victim impact evidence consists of "two distinct, but related, types: victim

character evidence and victim impact evidence." *Salazar v. State*, 90 S.W.3d 330 (Tex.

Crim. App. 2002). Victim impact evidence is the effect that a victim's death will have on

others, particularly the victim's family members. *Haley v. State,* 173 S.W.3d 510 (Tex.

Crim. App. 2005). However, victim impact evidence concerning the physical,

psychological or economic effect of the crime on the victim's family generally lacks "any

tendency to make more or less probable the existence of any fact of consequence at the

guilt stage of trial." *Matchett v. State*, 941 S.W.2d 922 (Tex. Crim. App. 1996).  As noted,

it is admissible during the *punishment phase* when the evidence has some bearing on the

defendant's personal responsibility and moral culpability. *Haley, supra.* It "is designed to

remind the jury that murder has foreseeable consequences to the community and the victim's survivors." *Salazar, supra*. In homicide cases, victim impact evidence is traditionally defined as "evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002). However, it is abundantly obvious that victim impact testimony is irrelevant and, therefore, inadmissible at the guilt/innocence portion of a trial because it does not tend to make more or less probable the existence of any fact of consequence with respect to guilt nor innocence. *Miller-El v. State*, 782 S.W.2d 892 (Tex. Crim. App. 1990). Furthermore, when this type of evidence is offered during the punishment phase, trial courts are cautioned to place appropriate limits on the amount, kind, and source of victim impact evidence. *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). The Court of Criminal Appeals requires heightened judicial supervision of this type of evidence in the punishment phase. *Salazar, supra.* If this is so, then most assuredly the same, if not more, supervision applies in the guilt/innocence phase.

The complained of evidence offered by the State was rank victim impact evidence. The irrelevant testimony by the State that the victim's widow was present in the courtroom, nor that she is a lovely lady, did not ". . . tend to make more or less probable the existence of any fact of consequence with respect to guilt nor innocence." (R.R. XXV-37). *Miller-El, supra.* The fact that she was weeping as she was being pointed out to the jury by the

State had no bearing on guilt/innocence, and was nothing more than clear and obvious irrelevant victim impact testimony. *Montgomery, supra.* It was nothing more than evidence of the psychological effects of the victim's death on his widow, the very type of evidence courts are warned against. *Matchett, supra.* The trial court clearly recognized this in its comments referenced hereinabove. However, it defies logic for the trial court to recognize that emotional displays by the audience members cannot be tolerated, but to tolerate emotional displays of the victim's widow as pointed out by the State's witness Bledsoe and in denying Appellant's requests. As such, it is clear that the trial court abused its discretion in allowing the introduction of this victim impact evidence at the guilt/innocence portion of Appellant's trial. *Walters, supra; Davis, supra.* Therefore, these points of error must be sustained by this Honorable Court.

**POINT OF ERROR NO. TWELVE:** The evidence was insufficient to support an affirmative finding to the special issue in the punishment phase regarding future dangerousness.

**POINT OF ERROR NO. THIRTEEN:** The evidence was insufficient to support the negative answer to the special issue regarding mitigating circumstances to warrant a life sentence rather than death.

In addition to being legally insufficient to support the finding of guilt of capital murder, Appellant urges that the evidence was insufficient to support the findings to the two special issues in favor of the State. The issues are discussed together, because they involve the same facts and intertwined authorities.

It is well established that the State must proffer sufficient evidence to prove the "future dangerousness" issue beyond reasonable doubt, which was the first special issue submitted to the jury in this cause. Appellant concedes that the Texas Court of Criminal Appeals has not established a burden of proof regarding the second special issue, to-wit: the "mitigating circumstances" issue; however, Appellant submits that recent decisions of the United States Supreme Court and other courts mandate the establishment of such a burden as explained herein. The same lack of evidence to establish that Appellant would commit future criminal acts of violence and constitute a continuing threat to society also constituted mitigating circumstances warranting a sentence of life rather than death. As this Honorable Court has noted " No killing exists in a vacuum. The circumstances of the

62

offense, and the events surrounding it may provide greater probative value that any other evidence regarding the probability of future acts of violence." *Johnson v. State*, 853 S.W.2d 527, 532 (Tex. Crim. App. 1992). However, the circumstances of the offense itself are not necessarily dispositive of the issue. Other cases have held the evidence insufficient to support a showing of future dangerousness, despite heinous offenses and other more compelling evidence offered by the State. *Beltran v. State,* 728 S.W.2d.382 (Tex. Crim. App. 1987); *Huffman v. State,* 746 S.W.2d 212 (Tex. Crim. App. 1988); *Keeton v. State,* 724 S.W.2d 58 (Tex. Crim. App. 1987); *Warren v. State,* 562 S.W.2d 474 (Tex. Crim. App. 1978); *Marras v. State,* 741 S.W.2d 395 (Tex. Crim. App. 1987); *Garcia v. State,* 626 S.W.2d 46 (Tex. Crim. App. 1982); *Smith v. State,* 779 S.W.2d 417 (Tex. Crim. App. 1989).

This Court has traditionally held that it will generally not review the factual sufficiency of evidence to support the findings on the special issues in a capital case. *McGinn v. State,* 961 S.W.2d.161 (Tex. Crim. App. 1998). This Court so held despite the fact that it has conducted a factual sufficiency review of the future dangerousness special issue in a capital case. *Hughes v. State,* 897 S.W.2d. 285 ( Tex. Crim. App. 1994). Instead this Court reviews the sufficiency of the evidence regarding the future dangerousness issue under the legal sufficiency standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d.456 (1979); *Johnson, supra*. Appellant urges this Court to review both special

issues under the same standard of requiring the State to prove its case beyond a reasonable doubt.

Appellant submits that under recent decisions of the United States Supreme Court, the State should have the burden to establish all facts necessary in order to obtain a sentence of death, including the burden of establishing the absence of mitigating factors sufficient to warrant a sentence of life. This should be the burden of the government attempting to execute one of its citizens, not the burden of the citizen fighting for his life. Under the developing theory in the federal court system under existing law, the absence of mitigating evidence should be required to be proved to a certain burden. *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed. 2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. ed. 2d 435 (2000); *Jones v. U.S.*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). Under such federal precedent, made applicable to the states through the Fourteenth Amendment to the United States Constitution, if it is logical to require a jury finding in order to support an enhanced sentence of imprisonment under the United States Constitution, it is likewise necessary to require the State to establish sufficient facts to a jury beyond a reasonable doubt before a sentence of death should be warranted. "The Eighth Amendment stands to assure that the State's power to punish is 'exercised within the limits of civilized standards.'" *Woodson v. North Carolina* 428 U.S.

280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Trop* v. *Dulles,* 356 U.S. 86, 78 S.Ct. 592, 2 L.Ed.2d 630 (1958). The United States Supreme Court recognized long ago that it is well established that the Eighth Amendment draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society." *Trop, supra.* Texas has clearly followed suit in enacting life without parole as another punishment for capital murder convictions. Therefore, as Texas has moved from an "all or nothing" approach to capital punishment as its standards of decency evolve, it is incumbent upon this Honorable Court to establish meaningful review of all of the evidence necessary for Texas to kill a certain population of its citizens. *Trop, supra.* Long ago the United States Supreme Court opined that "…for the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U.S. 51, 58 S.Ct. 59, 82 L.Ed.2d 43 (1937). How can justice be served without meaningful review of mitigating evidence adduced at trial?

Appellant invites this Honorable Court to review the entire record herein regarding the jury's findings related to the special issues submitted in punishment. This Honorable Court must review the mitigating evidence adduced and the State's response thereto in a meaningful review. *Trop, supra.* After doing so, there can be no conclusion but that the

evidence was insufficient to establish beyond a reasonable doubt that Appellant would pose a future danger to society, or that there were no mitigating circumstances to warrant a sentence of life rather than death. For these reasons, Appellant urges that this cause be reversed, and that the sentence be reformed to life imprisonment.

**POINT OF ERROR NO. FOURTEEN:** The trial court erred in admitting evidence of extraneous offenses allegedly committed by Appellant as the prejudicial effect of the extraneous acts outweighed any probative value, and the introduction thereof was reversible error.

The record herein is replete with extraneous offenses and bad acts introduced into evidence by the State over Appellant's objections in furtherance of the State's goal of causing Appellant's death. (R.R. XXXIV-42, 45, 50-51, 56-57). To restate them here would be to copy the entire punishment record from trial. As such, Appellant invites this Honorable Court to review the record in full to fully appreciate the error in allowing the extraneous offenses into evidence. The trial court even cautioned the jury as to the alleged purpose of introducing these extraneous offenses. (C.R. VIII-1504). The prejudicial effect of heir introduction clearly outweighed any served a singular purpose: to convict Appellant for being a bad person. Such an act is constitutionally repugnant. The evidence was therefore clearly inadmissible at the trial of Appellant.

The introduction of inadmissible offenses is reversible error, even when further explanatory evidence is introduced by the accused. *Autry v. State*, 264 S.W.2d 735 (Tex. Crim. App. 1954). Appellant contends that the doctrine of curative admissibility, as discussed in *Sweeten v. State*, 693 S.W.2d 454 (Tex. Crim. App. 1985) does not defeat his claim of reversible error, in that any further evidence regarding the extraneous offenses was offered only to diminish the harm caused by the erroneous admission of the testimony in

the first place. The evidence was not relevant to the issue of whether or not Appellant committed the capital murder of complainant Norman, and any value to the jury would have been outweighed by the prejudicial nature of the testimony and the State's unmitigated exploitation of such evidence. Rules 402, 403, Tex. R. Evid.

The general rule is that an accused is entitled to be tried for the offense for which he is charged and not for some collateral crime or for being a criminal generally, with exceptions allowing extraneous matters to be admitted only if it solves some material issue and the relevance outweighs the prejudicial effect. *Albrecht v. State*, 486 S.W.2d 97 (Tex. Crim. App. 1972). Said principle has been confirmed by reversals of convictions in which extraneous offenses were admitted during the guilt or innocence phase of a trial. *Couret v. State*, 792 S.W.2d 106 (Tex. Crim. App. 1990); *Fitzgerald v. State*, 782 S.W.2d 876 (Tex. Crim. App. 1990).

A two-part test analysis was established to govern the admissibility of such extraneous offenses. First, the transaction must be relevant to a material issue in the case. Second, the relevancy value of the evidence must outweigh its inflammatory or prejudicial effect. *Crank v. State*, 761 S.W.2d 328 (Tex. Crim. App. 1988), and cases therein cited.

The Ninth Court of Appeals has addressed this principle, finding error in the admission of an extraneous shooting, in *Duncantell v. State*, 877 S.W.2d 859 (Tex. App. -- Beaumont 1994). In *Duncantell,* the appellate court examined the relevant criteria for

68

consideration by a reviewing court, to-wit:

(1)     That the ultimate issue was not seriously contested by the opponent;

(2)     That the State had other convincing evidence to establish the ultimate issue to which the extraneous misconduct was relevant;

(3)     That the probative value of the misconduct evidence was not, either alone or in combination with other evidence, particularly compelling; and

(4)     That the misconduct was of such a nature that a jury instruction to disregard it for any  but its proper purpose would not likely have been efficacious.

In *Duncantell,* the court found that the ultimate issue of appellant's intent to kill the victim was very hotly contested, identical to the situation at bar.  While the State did not have other convincing evidence of Appellant's guilt of capital murder as indicted herein, that is likely because there <u>was</u> no other evidence based upon Appellant's innocence of the offense of capital murder as detailed in Point of Error Nos. One and Two hereinabove.  The probative value of the extraneous evidence was minimized by the fact that the other matters were not sufficiently identical or similar to the offense for which Appellant was on trial. Regarding the fourth criterion, the trial court in this case included a general charge on extraneous offenses, similar to the charge in *Duncantell, supra*, wherein the appellate court could not conclude with any measure of confidence that an instruction to disregard the evidence of the extraneous shootings would have been effective. (C.R. VIII-1504).  Such

69

an instruction could not have cured the harm. While the extraneous matters were too dissimilar to be probative of capital murder as indicted herein, they certainly could not have been more prejudicial. The jury likely convicted Appellant because the State's extraneous offenses established that Appellant was a "bad person". The court concluded in *Duncantell, supra*, that the trial court abused its discretion in failing to exclude the evidence of extraneous shootings, but thereafter affirmed the conviction after a harm analysis. In distinction to *Duncantell, supra*, the evidence of guilt to sustain the conviction as indicted herein is remarkably underwhelming. Based on this record, this Court cannot conclude beyond a reasonable doubt that the error in admitting the evidence of the extraneous offenses did not contribute to Appellant's conviction and death sentence. The prejudicial effect so far outweighed any probative value that it allowed Appellant to be tried as a criminal generally because he committed some other repugnant acts.

Consideration of the evidence leads to no conclusion other than that the evidence was offered simply to inflame the minds of the jurors in order to convict in the face of insufficient evidence. Appellant contends that the introduction of the evidence caused such unfair prejudice so as to constitute egregious harm. *Almanza v. State,* 686 S.W.2d 157(Tex. Crim. App. 1984). The court's charge, in a general instruction stating that "evidence may have been introduced" exacerbated the problem by instructing the jury that it could consider such evidence for purposes such as proof of intent, motive, system,

70

scheme or design.  A discussion of the application of a jury charge which causes egregious harm, when considering its interrelationship with the facts of a case, is discussed in *Abdnor v. State,* 871 S.W.2d 726 (Tex. Crim. App. 1994).  Under the standard of review and harm analysis discussed in *Abdnor, supra,* and *Almanza, supra,* Appellant contends that the fundamental error in the admission of the evidence caused him egregious harm.

In the often-cited case of *Boutwell v. State,* 719 S.W.2d 164 (Tex. Crim. App. 1985), this Texas Court of Criminal Appeals discussed at length the harm in the introduction of propensity evidence, and the basis for the exclusionary rule preventing the introduction of extraneous offenses.  This Court held that such extraneous acts are inadmissible if they do not meet the test, *i.e.,* the transaction must be relevant to a material issue in the case and the relevancy value of the evidence must outweigh its inflammatory or prejudicial potential.  *Boutwell, supra*. The evidence of the dissimilar acts adduced by the State fails on both counts.  By analogy, Appellant points out that in *Baker v. State,* 781 S.W.2d 688 (Tex. App.-Ft. Worth 1989), extraneous acts much more relevant than the act elicited herein were deemed to be not sufficiently similar to the offense to be probative on the issue of intent.

By allowing the introduction of extraneous acts, the State was allowed to support its conviction of Appellant by the introduction of the extraneous repugnant acts which could serve no purpose other than to establish that Appellant was a bad person and acted

71

in conformity therewith, and which evidence was extremely prejudicial. For these reasons,

Appellant urges that this cause be reversed.

## PRAYER

WHEREFORE, it is respectfully submitted, and Appellant prays, that the Court of Criminal Appeals, Austin, Texas, should reverse the judgment, set aside the conviction of Appellant, and enter an acquittal, or in the alternative, grant Appellant a new trial.

Respectfully submitted,


/s/ Gerald E. Bourque
GERALD E. BOURQUE
Appointed Counsel for Appellant
Attorney at Law
24 Waterway Ave., Suite 660
The Woodlands, TX 77380
PHONE: (281) 379-6901
FAX: (832) 813-0321
TBL #02716500


## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Brief for Appellant was served upon appellee by placing in the United States Mail, postage prepaid, a copy to the Office of the District Attorney, Harris County, 1201 Franklin, Houston, Texas, 77002, on the date of filing hereof.


/s/ Gerald E. Bourque
GERALD E. BOURQUE

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 9.4(i)(1), 9.4(i)(2)(A), and 9.4(i)(3), Tex. R. App. Proc, I hereby certify that the word count of the program used to prepare this document is 14, 176 words.

/s/ Gerald E. Bourque
GERALD E. BOURQUE